# UNITED STATES *v.* MINNESOTA.

No. 17, Original.   Argued January 4, 5, 1926.—Decided March 1, 1926.

1. A suit against a State brought by the United States as guardian of tribal Indians to recover the title, or money proceeds, of lands alleged to have been patented to the State by the United States in breach of its trust obligations to the Indians,—is not a suit in which the Indians are the real parties in interest, but one in which the United States is really and directly interested; and is within the original jurisdiction of this Court.  P. 193.

2. The six year limitation (Act of March 3, 1891,) is inapplicable where the United States sues to annul patents issued in alleged violation of rights of its Indian wards and of its obligations to them.  P. 195.

3. State statutes of limitations do not apply to such suits.  *Id.*

4. The United States, as guardian of Indians, is without right to recover from a State lands which, in a suit between the Indians and the United States in the Court of Claims, were adjudged to have been rightly patented to the State.  P. 199.

5. The courts can not go behind a treaty with Indian tribes for the purpose of annulling it upon the ground that in its negotiation the representatives of the Indians were prevented from exercising their free judgment.  P. 201.

6. The Swamp Land Act of 1850 operated as a grant *in praesenti.* P. 202.

7. The Act of March 12, 1860, extending the provisions of the Swamp Land Act of 1850 to Minnesota and Oregon, with a proviso " that the grant hereby made shall not include any lands which the government of the United States may have reserved, sold, or disposed of (in pursuance of any law heretofore enacted) prior to the confirmation of title to be made under the authority of the said act," granted those States an immediate inchoate title to the public swamp land in their confines, to become perfect as of the date

of the Act when the lands were identified and patented, excluding from the grant all lands which might be reserved, sold or disposed of in pursuance of any law theretofore enacted, prior to the issuance of patent. P. 203.

8. Long continued and uniform practice of officers charged with the duty of administering a land law is persuasive in its construction. P. 205.

9. Lands which have been appropriated or reserved for a lawful purpose are not public, and are impliedly excepted from subsequent laws, grants, and disposals which do not specially disclose a purpose to include them. P. 206.

10. Lands within the Leech Lake, Winnibigoshish, and Cass Lake Indian reservations when the swamp land grant was extended to Minnesota, were excepted from that grant. P. 206.

11. Patenting of such lands to the State as swamp land was contrary to law and in derogation of the rights of the Chippewas under the Act of January 14, 1889. P. 206.

12. The proviso of the Act of March 12, 1860, *supra*, is not to be construed as authorizing appropriation by treaty with the Indians of swamp lands which were public when the Act took effect and the inchoate title to which had therefore passed to the State. P. 207.

13. Assuming that the treaty-making power might divest rights of property which could not constitutionally be divested by an Act of Congress, no treaty should be construed as so intending unless a purpose to do so be shown in the treaty beyond reasonable doubt. P. 207.

14. Treaties making general reservation of very extensive areas " as future homes " of Chippewa Indians, are to be construed as excepting swamp lands which had theretofore been granted to Minnesota. P. 209.

15. The provision of the Act of March 12, 1860, *supra*, for selection of lands thereafter to be surveyed, within two years from the adjournment of the State legislature, " at the next session, after notice by the Secretary of the Interior to the Governor of the State that the surveys have been completed and confirmed," is to be construed, in accordance with the practice under the Swamp Land Act of 1850, as permitting the State, through a legislative act (like that passed by Minnesota in 1862,) to elect to abide by the field notes of the government survey, and as treating such legislative election, approved by the Governor, as a continuing selection of all lands shown by such field notes to be swamp. P. 211.

16. The amendment of the Minnesota constitution adopted in 1881, declaring that the lands acquired by the State under the Swamp Land Act should be sold and the proceeds devoted to education, did not disable the State from reclaiming the lands or evince a purpose not to reclaim them. P. 213.

17. The direction of the Swamp Land Act of 1850 that the lands granted, or their proceeds, " be applied exclusively, or as far as necessary," to effecting their reclamation, leaves the application to the judgment of the grantee State, and is not enforceable by the courts. P. 213.

18. The Act of January 14, 1889, and the cession of lands thereunder by the Chippewa Indians, related only to lands in which the Indians had an interest, and the resulting rights and obligations of the Indians and the United States were limited accordingly. P. 214.

19. The damages recoverable from the State of Minnesota on account of lands ceded to the United States by the Chippewas pursuant to the Act of January 14, 1889, which were erroneously patented to the State and by her sold, should be determined on the basis of the prices that would have controlled had the particular lands been dealt with under that statute. P. 215.

Bill dismissed in part; decree on the remainder for the United States.

SUIT brought in this Court by the United States against Minnesota to cancel patents issued to the State for lands under the Swamp Land Grant, or to recover the value of such of the lands as the State had sold.

*Mr. W. W. Dyar,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell* and *Assistant Attorney General Parmenter,* were on the brief, for complainant.

The treaty of 1855 was negotiated under circumstances of haste and pressure, with chiefs not adequately representing their bands; the small scattered reservations constituted by it were inadequate to the Indian needs; and the whole arrangement was so disastrous to them as to impose upon the Government a moral obligation to restore some of the lands then ceded. This moral obligation was recognized and acted upon by the Government in the treaty of 1863-4, by creating the enlarged Leech

Lake Reservation.  The lands thus restored were unfit for agriculture, insufficient and inadequate in other respects, and this was expressly acknowledged by the United States in the treaty of 1867, establishing the White Earth Reservation on lands ceded in 1855.  The treaties constituting the new and enlarged reservations out of lands ceded in 1855 were without exceptions or qualifications, and constituted solemn engagements that all the lands included in those reservations should be Indian lands.  The Nelson Act contained an equally solemn engagement that all the lands (save only those embraced in pending entries) should be sold for the benefit of the Indians, either as "pine lands" or "agricultural lands."

The statutes of limitations apply only to public lands subject to disposition under the land laws, and not to Indian lands.  *Northern Pacific Ry.* v. *United States,* 227 U. S. 355; *La Roque* v. *United States,* 239 U. S. 62. The defenses of stale claim and laches can not be set up against the Government.  *United States* v. *Dalles Military Road Co.,* 140 U. S. 599, citing *United States* v. *Kirkpatrick,* 9 Wheat. 720; *United States* v. *Van Zandt,* 11 Wheat. 184; *United States* v. *Nicholl,* 12 Wheat. 505; *Dox* v. *Postmaster General,* 1 Pet. 318; *Lindsey* v. *Miller,* 6 Pet. 666; *Gibson* v. *Chouteau,* 13 Wall. 92; *Gaussen* v. *United States,* 97 U. S. 584; *Steele* v. *United States,* 113 U. S. 128; *United States* v. *Insley,* 130 U. S. 263.  And if laches were ever imputable to the United States, it certainly can not be recognized as a defense where the suit is to assert the rights of a people dependent upon it for protection and actually incapable of asserting their own rights against the State, even though they may be citizens thereof.  The mere granting of citizenship does not dissolve the tribal relation and leave the Indians to assert their own rights in the courts.  The United States may, and still does continually, bring suits in its own name, without joining them as plaintiffs, to enforce the

trusts which devolve upon it under treaties and Acts of Congress. *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294; *United States* v. *Rickert,* 188 U. S. 432; *United States* v. *Celestine,* 215 U. S. 278; *Tiger* v. *Western Investment Co.,* 221 U. S. 286; *United States* v. *Sandoval,* 231 U. S. 28; *United States* v. *Nice,* 241 U. S. 591. *United States* v. *Waller,* 243 U. S. 452, distinguished.

The jurisdictional objection is without merit.

The swamp-land grant of 1850 did not pass an immediate, indefeasible title to lands unsurveyed, not open to settlement, and still in the actual occupancy of Indians. *Tubbs* v. *Wilhoit,* 138 U. S. 134.

The Act of March 2, 1855, (10 Stat. 634,) shows clearly that Congress did not then understand that the original grant conveyed an immediate and indefeasible title to specific tracts of swamp land. Otherwise it would not have directed the issuance of patents to entrymen under other land laws, of lands " claimed as swamp." It is manifest that, if the grant conveyed an absolute present title, Congress had no right, as in the second Act of March 3, 1857, (11 Stat. 251,) to except from the confirmation swamp lands " interfered with by an actual settlement under any existing law," etc.

So far as concerns the general expressions used in the opinions, all the cases in this Court agree that the swamp land grant was a grant *in praesenti;* and the earlier opinions, especially those of Mr. Justice Field, lay special stress upon this feature. Later cases, with equal emphasis, say that the grant is inchoate.

As to concrete decisions, the cases divide themselves into three classes.

1. Cases in which the States had sold the lands to others, and the Secretary had failed or refused to identify them as swamp or non-swamp. In these the Court, expressly on the ground that the Secretary had failed to perform his duty, and in order to prevent a failure of

justice, held that the true character of the lands could be shown by parol or other evidence, and if proven to be swamp, the swamp-land claimant should prevail. *Railroad Co.* v. *Fremont County*, 9 Wall. 89; *Railroad Co.* v. *Smith,* 9 Wall. 95; *Wright* v. *Roseberry,* 121 U. S. 488. *Tubbs* v. *Wilhoit,* 138 U. S. 134, was of the same general character, though a resort to parol evidence was not found necessary in that case. Besides, the decisions in the last two cases mentioned were not made under the swamp-land grant alone, but under that Act and the Act of July 23, 1866, (14 Stat. 218, c. 219,) to quiet titles in California.

2. Cases in which the Secretary had made a timely identification of the lands as swamp or non-swamp, either by listing them as swamp or by patenting or certifying them under other grants. In these, the Secretary's determination is always held to be conclusive, and no other evidence is admissible to show the true character of the lands. *Chandler* v. *Calumet & Hecla M. Co.,* 149 U. S. 79; *Ehrhardt* v. *Hogaboom,* 115 U. S. 67; *French* v. *Fyan,* 93 U. S. 169; *McCormick* v. *Hayes,* 159 U. S. 332; *Rogers Locomotive Works* v. *Emigrant Co.,* 164 U. S. 559.

3. Cases holding that, even where the lands have been surveyed and the field-notes have been agreed on as the test of swamp or non-swamp, it is still within the power of the Secretary, up to the actual issuance of the patent, to cause a resurvey and determination of the character of the lands to be made. *Michigan Land & Lumber Co.* v. *Rust,* 168 U. S. 589; *Brown* v. *Hitchcock,* 173 U. S. 473; *Niles* v. *Cedar Point Club,* 175 U. S. 300; *Little* v. *Williams,* 231 U. S. 335; *Chapman & Dewey Lumber Co.* v. *St. Francis Levee Dist.,* 232 U. S. 186; *Lee Wilson & Co.* v. *United States,* 245 U. S. 24.

The result of all these cases, therefore, is that, even under the original swamp-land grant, the States' rights prior to survey, identification, and patenting or certifica-

tion were at most " inchoate," " not perfected." A grant by the United States without consideration, not consummated by patent or any other instrument of title, " inchoate," and not enforceable by any judicial or other process, is certainly not of such dignity that the United States may not, in the performance of compelling moral obligations to its dependent wards, by treaties reserve a portion of those lands for their use and finally dispose of it for their benefit.

In the present case, the fact is that, before any patents were issued to the State for these lands, before any attempt by it or the land department to identify them as swamp or dry, even before any survey, the United States, recognizing that it had failed to make adequate provision for the future of these Indians, by solemn treaties established, out of lands formerly ceded but never actually vacated by them, new and enlarged reservations, by language containing no exceptions and nothing whatever from which the Indians (or any white man) could have understood that the large areas of swamp land within the boundaries named were not to become theirs as much as the dry lands. Looking for the moment at the more technical side of the question, the general rule is that while, as between rival private claimants under the general land laws, or under grants to the States, railroads, etc., the title when once passed by formal instrument relates back to the initiatory act, or to the date of the granting statute, yet, as against the United States, no right or title vests until payment is made for the lands or they are earned (being the equivalent of payment) by the doing of the things required of the grantee in fulfillment of the purposes of the grant. *Frisbie* v. *Whitney,* 9 Wall. 187; *Yosemite Valley Case,* 15 Wall. 77; *Shepley* v. *Cowan,* 91 U. S. 330.

The recent cases of *Payne* v. *Central Pac. Ry.,* 255 U. S. 228; *Payne* v. *New Mexico,* 255 U. S. 367; *Wyoming* v.

*United States,* 255 U. S. 489, are no exceptions to this rule.

The present case is the first ever brought by the United States to recover swamp lands on any ground, and it is further differentiated by the fact that it is to recover Indian lands erroneously patented as swamp; and we can conceive of no valid reason why *Frisbie* v. *Whitney,* 9 Wall. 187, and the two cases cited with it, do not apply.

The swamp-land grant was of no higher dignity and gave a right of no greater sanctity until the lands were surveyed and identified than the school grant itself, as to which this Court has repeatedly held that Congress may otherwise dispose of the lands up to the time the school sections are identified by actual survey. Certainly, the inchoate right to unsurveyed, unidentified swamp lands was not superior to that trust, arising out of the Constitution itself, upon which the United States held the beds of navigable waters in the territories for the benefit of future States. And yet, that trust did not prevent the United States, before the admission of a State, from diverting portions of the beds of navigable waters to the purpose of fulfilling "international obligations," "or to carry out other public purposes appropriate to the objects for which the United States holds the Territory." *Shively* v. *Bowlby,* 152 U. S. 1. And, applying this doctrine, this Court has upheld the power of the Government, by an Indian treaty, to subject lands under navigable waters to an easement inconsistent with the full exercise of property and sovereign rights therein by the subsequently created State. *United States* v. *Winans,* 198 U. S. 371.

The Act extending the swamp-land grant to Minnesota so modified its original terms as clearly to indicate that neither the legal title nor any vested equitable right was to pass until the issuance of patent. Act of March 12, 1860, c. V, 12 Stat. 3. If the Act was in any sense a

grant *in praesenti,* then the lands revert to the United States on the failure of the State to select them within the prescribed time. *Pengra* v. *Munz,* 29 Fed. 830. A promise of a grant is made if and when the States shall make the selections within the times prescribed.

The lands reserved to the Indians by the treaties of 1863–4 and 1867 are embraced by the express exception in § 1 of the act extending the swamp-land grant to Minnesota. The State is estopped by her silence while the two treaties were in the making and while the cessions under the Nelson Act were in course of negotiation.

Even if the State had acquired a right, inchoate or otherwise, that right was divested by the two treaties. The treaty-making power has no express limitations. It therefore extends at least to all matters which, in the intercourse of nations and peoples, have customarily been the subjects of negotiation and settlement by treaty. Some limitations are, of course, necessarily implied. One power vested in the general Government can not be made the means of destroying others, or of destroying the powers reserved to the States, or of placing one State on an inequality with the others. But a treaty ceding landed property of a State does none of these things. It leaves the sovereignty and status of the State absolutely untouched. *Missouri* v. *Holland,* 252 U. S. 416; Attorney General's opinion (25 Opin. 626).

If the State originally acquired any rights, inchoate or otherwise, she had forfeited them as to these lands, long before any patents issued, by a constitutional amendment tying the hands of her legislature and irrevocably diverting the swamp lands and their proceeds from the express purpose for which they were given her by the United States. After the patents issued she again forfeited the lands by actually diverting all the proceeds of these very lands from that purpose.

The Pillager, Winnibigoshish and the Mille Lac Reservations have an exceptional status.

The State should account for all that she has received, or is to receive, for lands sold by her, with interest; for the price of any minerals removed from lands sold with reservation of mineral rights; and for the price of the lumber or timber sold from lands still retained, or sold after removal of the timber, with interest.

*Messrs. M. J. Brown* and *G. A. Youngquist,* Assistant Attorney General of Minnesota, with whom *Messrs. Clifford L. Hilton,* Attorney General of Minnesota, and *Charles R. Pierce,* were on the brief, for defendant.

This suit is one against the State of Minnesota by citizens thereof; and, as a consequence, the Court is without jurisdiction to entertain it. *California* v. *Southern Pac. Ry.,* 157 U. S. 229; *Minnesota* v. *Hitchcock,* 185 U. S. 373; *Hans* v. *Louisiana,* 134 U. S. 1; *Hollingsworth* v. *Virginia,* 3 Dall. 378; *Ex parte Madrazzo,* 7 Pet. 625; *Chandler* v. *Dix,* 194 U. S. 590; *Lankford* v. *Platte Iron Works,* 235 U. S. 461; *American Water Softener Co.* v. *Lankford,* 235 U. S. 496; *New Hampshire* v. *Louisiana,* and *New York* v. *Louisiana,* 108 U. S. 76; *Louisiana* v. *Texas,* 176 U. S. 1; *North Dakota* v. *Minnesota,* 263 U. S. 365.

The suit is barred by the statute of limitations. It is to cancel patents issued by the United States to Minnesota, and was not commenced within six years following the issuance thereof. Act of March 3, 1891, c. 561, § 8, 26 Stat. 1096; *Cramer* v. *United States,* 261 U. S. 219. Assuming that the suit is maintainable by the United States, the Minnesota statute of limitations applies, the suit being one against Minnesota for the sole benefit of the Indians. *Curtner* v. *United States,* 149 U. S. 662.

The swamp-land grant was one *in praesenti.* This Court has consistently adhered to the fundamental rule of the *Roseberry Case,* 121 U. S. 488, namely, that the

grant was one *in praesenti* and that upon perfection of title such title relates back to the date of the grant. Later decisions, relied on by plaintiff, are not to the contrary. *Mich. Land & Lbr. Co.* v. *Rust,* 168 U. S. 589; *Brown* v. *Hitchcock,* 173 U. S. 473; *Niles* v. *Cedar Point Club,* 175 U. S. 300; *Little* v. *Williams,* 231 U. S. 335; *Chapman & Dewey Lbr. Co.* v. *St. Francis Levee Dist.* 232 U. S. 186; *Lee Wilson & Co.* v. *United States,* 245 U. S. 24.

Upon the issuance of patents, perfect title vested in Minnesota, and such title related back to the date of the grant, March 12, 1860, cutting out all claims based on the Treaties of 1863, 1864 and 1867.

The character of the grant with respect to its application to Minnesota was not changed by the Act of 1860.

The act as extended to Minnesota was administered, and with particular reference to the lands in question, in strict accord with the construction of many years' standing by those charged with the duty of administering the act.

The construction of the grant by the Interior Department is in accord with the true intent and meaning of the act; if doubt exists as to this, the grant having been consistently administered in accordance with it, such construction should be accepted by the court.

The Treaties of 1863, 1864 and 1867 did not operate to cancel the grant of 1860.

The lands in question did not pass to the United States as a result of cessions made pursuant to the Nelson Act (25 Stat. 642,) for disposition for the benefit of the Indians or otherwise.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This is a suit in equity brought in this Court by the United States against the State of Minnesota to cancel

patents issued to her for certain lands under the swamp
land grant, or, where the State has sold the lands, to
recover their value and to leave the patents uncanceled
as to such lands.   Seven patents for about 153,000 acres
are brought in question.   The first was issued May 13,
1871, and the others at different times from May 17,
1900, to June 10, 1912.   The bill was filed May 7, 1923.
The State answered, and the case was heard and submit-
ted on the pleadings and much documentary evidence.
The issues presented are chiefly of law.

It is not questioned that the lands were swampy and
in this respect within the swamp land grant, nor that the
patents were sought by the State and issued by the land
officers in good faith.   But it is insisted, on behalf of the
United States, first, that by treaties and other engage-
ments with the Chippewa Indians entered into before the
patents were issued the United States became obligated to
apply the lands and the proceeds of their sale exclusively
to the use, support and civilization of the Chippewas,
and that this operated to exclude or withdraw the lands
from the swamp land grant; secondly, that the State
failed to select or claim the lands within the period pre-
scribed in the act making the grant, and thereby lost any
right which she may have had to have them patented to
her; and, thirdly, that the grant was subject to a condition
whereby the State was required to apply the lands or
the proceeds of their sale in effecting their reclamation by
means of needed ditches, and that before the patents were
issued the State, by an amendment to her constitution,
had disabled herself from complying with that condition
and proclaimed her purpose to apply the lands and their
proceeds otherwise, and thereby had lost any right she
may have had to receive the patents.   Stating it in an-
other way, the insistence, on the part of the United States,
is that the lands were appropriated or set apart for the
Chippewas, that the land officers, misconceiving their au-

thority in the premises, issued the patents contrary to the provisions of the act making the swamp land grant and in disregard of obligations to the Indians which the United States had assumed and was bound to respect, that those obligations are still existing and must be performed, and that to enable the United States to proceed with their performance it is entitled to a cancelation of the patents as respects such of the lands as still are held by the State and to recover the value of such as she has sold.

Besides disputing the several contentions just stated, the State advances two propositions, either of which her counsel conceive must end the case.

The first proposition is that the suit is essentially one brought by the Indians against the State, and therefore is not within the original jurisdiction of this Court. In support of the proposition it is said that the United States is only a nominal party—a mere conduit through which the Indians are asserting their private rights,—that the Indians are the real parties in interest and will be the sole beneficiaries of any recovery, and that the United States will not be affected whether a recovery is had or denied.

It must be conceded that, if the Indians are the real parties in interest and the United States only a nominal party, the suit is not within this Court's original jurisdiction. *New Hampshire* v. *Louisiana,* 108 U. S. 76; *Hans* v. *Louisiana,* 134 U. S. 1; *North Dakota* v. *Minnesota,* 263 U. S. 365, 374–376. But the allegations and prayer of the bill—by which the purpose and nature of the suit must be tested—give no warrant for saying that the Indians are the real parties in interest and the United States only a nominal party. At the outset the bill shows that the Indians although citizens of the State, are in many respects, and particularly in their relation to the matter here in controversy, under the guardianship of the

United States and entitled to its aid and protection.   This
is followed by allegations to the effect that the Indians had
an interest in the lands before and when they were pat-
ented to the State, that the patents were issued by the
land officers without authority of law and in violation of
an existing obligation of the United States to apply the
lands and the proceeds of their sale exclusively to the
use and benefit of the Indians, and that it is essential to
the fulfillment of that obligation that the lands—or, where
any have been sold, their value in their stead—be restored
to the control of the United States.   And the prayer is
for a decree compelling such a restoration and declaring
that the lands and moneys are to be held, administered
and disposed of by the United States conformably to that
obligation.

Whether in point of merits the bill is well grounded or
otherwise, we think it shows that the United States has
a real and direct interest in the matter presented for
examination and adjudication.   Its interest arises out of
its guardianship over the Indians and out of its right to
invoke the aid of a court of equity in removing unlawful
obstacles to the fulfillment of its obligations; and in both
aspects the interest is one which is vested in it as a sov-
ereign.   *Heckman* v. *United States,* 224 U. S. 413, 437–
444; *United States* v. *Osage County,* 251 U. S. 128, 132–
133; *La Motte* v. *United States,* 254 U. S. 570, 575;
*Cramer* v. *United States,* 261 U. S. 219, 232; *United
States* v. *Beebe,* 127 U. S. 338, 342–343; *United States* v.
*New Orleans Pacific Ry. Co.,* 248 U. S. 507, 518.   And
see *United States* v. *Nashville, Chattanooga & St. Louis
Ry. Co.,* 118 U. S. 120, 126; *In re Debs,* 158 U. S. 564, 584.

Counsel for the State point out that the Indians could
neither sue the State to enforce the right asserted in their
behalf nor sue the United States for a failure to call on
the State to surrender the lands or their value; and from
this they argue that the United States is under no duty

and has no right to bring this suit.    But the premise does not make for the conclusion.    The reason the Indians could not bring the suits suggested lies in the general immunity of the State and the United States from suit in the absence of consent.    Of course the immunity of the State is subject to the constitutional qualification that she may be sued in this Court by the United States, a sister State, or a foreign State.    *United States* v. *Texas,* 143 U. S. 621, 642, *et seq.*    Otherwise her immunity is like that of the United States.    But immunity from suit is not based on and does not reflect an absence of duty. So the fact that the Indians could not sue the United States for a failure to demand that the State surrender the lands or their value does not show that the United States owes no duty to the Indians in that regard. Neither does the fact that they could not sue the State show that the United States is without right to sue her for their benefit.    But it does make for and emphasize the duty, and therefore the right, of the United States to sue.    This is a necessary conclusion from the ruling in *United States* v. *Beebe, supra,* where much consideration was given to the duty and right of the United States in respect of the cancelation of patents wrongly issued. This Court there pointed out special instances in which the Government might with propriety refrain from suing and leave the individuals affected to settle the question of title by personal litigation, and then said that where the patent, if allowed to stand, "would work prejudice to the interests or rights of the United States, or would prevent the Government from fulfilling an obligation incurred by it, either to the public or to an individual, which personal litigation could not remedy, there would be an occasion which would make it the duty of the Government to institute judicial proceedings to vacate such patent."

The State's second proposition is that the suit is barred by the provision in the Act of March 3, 1891, c. 561, § 8.

26 Stat. 1095, 1099 (also c. 559, p. 1093), limiting the time within which the United States may sue to annul patents, and, if not by that provision, then by a law of the State. But both branches of the proposition must be overruled. The provision in the Act of 1891 has been construed and adjudged in prior decisions—which we see no reason to disturb—to be strictly a part of the public land laws and without application to suits by the United States to annul patents, as here, because issued in alleged violation of rights of its Indian wards and of its obligations to them. *Cramer* v. *United States, supra,* p. 233; *La Roque* v. *United States,* 239 U. S. 62, 68; *Northern Pacific Ry. Co.* v. *United States,* 227 U. S. 355, 367. And it also is settled that state statutes of limitation neither bind nor have any application to the United States when suing to enforce a public right or to protect interests of its Indian wards. *United States* v. *Thompson,* 98 U. S. 486; *United States* v. *Nashville, Chattanooga & St. Louis Ry. Co., supra,* pp. 125–126; *Chesapeake & Delaware Canal Co.* v. *United States,* 250 U. S. 123, 125.

We come therefore to the merits, which involve a consideration of the past relation of the Indians to the lands and of the nature and operation of the swamp land grant to the State.

The lands are all within the region formerly occupied by the Chippewas. By a treaty made in 1837 the Indians ceded the southerly part of that region to the United States, 7 Stat. 536; and by a treaty made in 1855 they ceded to it a further part adjoining that ceded before, 10 Stat. 1165. But by the latter treaty nine reservations were set apart out of the ceded territory as " permanent homes " for designated bands. Four of these reservations were called the Mille Lac, the Leech Lake, the Winnibigoshish and the Cass Lake. This was the situation in 1860 when the swamp land grant theretofore made to other States was extended to Minnesota. Most of the

lands in question are within what was then ceded territory and outside those reservations. The rest are within the Mille Lac, Leech Lake, Winnibigoshish and Cass Lake reservations as then defined.

By a treaty made in 1863 six of the reservations, including the Mille Lac but not the Leech Lake, the Winnibigoshish or the Cass Lake, were ceded to the United States, and a large reservation, surrounding the Leech Lake, the Winnibigoshish and the Cass Lake reservations, was set apart as " future homes " for the Indians then on the ceded reservations, 12 Stat. 1249. The twelfth article of that treaty declared that the Indians were not obligated to remove from the old reservations to the new until certain stipulations respecting preparations for their removal were complied with by the United States. The United States complied with the stipulations and most of the Indians on the ceded reservations other than the Mille Lac removed, but some remained on and around those reservations. The same article declared: " Owing to the heretofore good conduct of the Mille Lac Indians [the band occupying the ceded Mille Lac reservation], they shall not be compelled to remove as long as they shall not in any way interfere with or in any manner molest the persons or property of the Whites." Some of the Mille Lac band removed, but many remained on and around the ceded reservation. A treaty negotiated in 1864 and amended and ratified in 1865 enlarged the large reservation set apart in 1863, 13 Stat. 693. By a treaty made in 1867 the greater part of the large reservation set apart in 1863 and enlarged in 1865 was ceded to the United States and an area of approximately 36 townships around White Earth Lake was set apart as a new reservation, to which the Indians in the ceded territory were to remove, 16 Stat. 719. That treaty left the Leech Lake, Winnibigoshish and Cass Lake reservations within what remained of the large reservation established in 1863 and

1865. After the White Earth reservation was created many of the Indians in the ceded territory removed to it, but some remained on or around the ceded tracts. By executive orders made in 1873, 1874 and 1879 additions were made to some of the reservations. The next change came in 1889.

Under the Act of January 14, 1889, c. 24, 25 Stat. 642, the Chippewas ceded and relinquished to the United States all of their reservations, here described as then existing, save as a part of the White Earth reservation was set aside for allotments in severalty which were to be made by the United States and accepted by the Indians as their homes. The cession was declared to be for the purposes and on the terms stated in that Act and was to become effective on the President's approval, which was given March 4, 1890. The Act provided that the lands so ceded should be surveyed, classified as pine or agricultural and disposed of at regulated prices, and that the net proceeds should be put into an interest-bearing fund of which the Chippewas were to be the beneficiaries.

The Mille Lac reservation, although included in the cession of 1863, was again included in the cession under the Act of 1889. It was surveyed and opened to settlement and disposal under the public land laws after the cession of 1863; but this led to a controversy with the Indians over the meaning and effect of the clause in the twelfth article of the treaty of 1863, relating to the removal of the Mille Lac band, and that controversy resulted in a suspension of disposals. The controversy continued up to the cession under the Act of 1889 and was adjusted and composed in that cession. *United States* v. *Mille Lac Chippewas*, 229 U. S. 498. But after the survey and before the suspension about 700 acres,* shown by

* This may include one or two small subdivisions which had been patented theretofore to a Mille Lac chief, Shaw-vosh-kung, under the first article of the treaty of 1865.

the field notes of the survey to be swampy, were patented to the State under the swamp land grant. The patent of May 13, 1871, was for these lands.

In 1909, under a permissive statute, c. 126, 35 Stat. 619, the Mille Lac band brought a suit against the United States in the Court of Claims to recover for " losses sustained by them or the Chippewas of Minnesota " by reason of the opening of the Mille Lac reservation to settlement and disposal. In that suit recovery was sought in respect of all lands in that reservation which the United States had disposed of otherwise than under and in conformity with the Act of 1889, including those patented to the State as swamp lands May 13, 1871. Evidence was introduced showing the lands so patented and their value, and one of the questions discussed in the briefs and pressed for decision at the final hearing was whether the Indians were entitled to recover in respect of the lands in that patent, or were precluded therefrom by a provision in the Act of 1889, as accepted by the Indians, which the United States insisted had operated to confirm the State's claim under the patent. By the ultimate findings and judgment that controversy was resolved against the Indians and in favor of the United States. 51 Ct. Cls. 400. No appeal was taken from that judgment and it became final. It awarded about $700,000 to the Indians on account of the disposal of other lands, held not within the confirmatory provision, and the award was paid by putting the money in the Chippewa fund before mentioned, c. 464, 39 Stat. 823. Of course, the United States is without right to any recovery here in respect of the lands as to which it was adjudged there to be free from any obligation or responsibility to the Indians. So the lands in the patent of May 13, 1871, need not be considered further.

The other reservations were surveyed after the cession under the Act of 1889. The field notes of the survey

showed some of the lands to be swampy, and 152,124.18 acres so shown were patented to the State under the swamp land grant. They are the lands for which patents were issued from May 17, 1900, to June 10, 1912. Of these lands 706 acres were within the Leech Lake, Winnibigoshish and Cass Lake reservations as defined and existing in 1860, when the swamp land grant was extended to the State, and the others are lands which had been ceded by the treaty of 1855 and were public lands in 1860.

In the brief on behalf of the United States an effort is made to overcome the cession in the treaty of 1855 by inviting attention to particular statements in correspondence and other papers of that period and arguing therefrom that the treaty was hastily negotiated with chiefs and warriors, not fairly representative of the bands affected, who were brought to Washington for the purpose and were there subjected to influences and pressure which prevented them from exercising a free judgment and adequately portraying and protecting the interests of such bands. But we think the argument is without any real basis in fact. The inferences sought to be drawn from the statements to which attention is invited are refuted rather than supported by the papers as a whole. While it appears that there was some dissatisfaction with the original selection of those who were to represent the Indians, it also appears that other chiefs and warriors representing the Indians who were dissatisfied were sent to Washington by the local superintendent of Indian affairs and that they actively participated in the negotiations and signed the treaty. The negotiations occupied ten sessions spread over a period of seven days and were reported. The reports indicate that the Indians who participated ably and loyally represented all the bands and spoke for them openly and with effect. Indeed, they persuaded the representatives of the United States to make concessions advantageous to all the bands which were

much more favorable than those first proposed.   They included headchiefs, subchiefs and warriors, 16 in all.   Several had represented these Chippewas in making earlier treaties, and afterwards came to represent them in making others.

But, while the earnestness of counsel has induced us to examine the basis of the argument advanced, there is another reason why the effort to overcome the cession must fail.   Under the Constitution the treaty-making power resides in the President and Senate, and when through their action a treaty is made and proclaimed it becomes a law of the United States, and the courts can no more go behind it for the purpose of annulling it in whole or in part than they can go behind an act of Congress.   Among the cases applying and enforcing this rule some are particularly in point here.   In *United States* v. *Brooks,* 10 How. 442, where a grant made to certain individuals by the Caddo Indians in a treaty between them and the United States was assailed by the United States as induced by fraud practiced on the Indians, the Court held that " the influences which were used to secure " the grant could not be made the subject ·of judicial inquiry for the purpose of overthrowing the treaty provision making it.   In *Doe* v. *Braden,* 16 How. 635, a provision in the treaty whereby Spain ceded Florida to the United States which annulled a prior grant to the Duke of Alagon was assailed as invalid on the ground that the King, who made the treaty, was without power under the Spanish constitution to annul the grant.   But the Court refused to go behind the treaty and inquire into the authority of the King under the law of Spain—and this because, as was explained in the decision, it was for the President and Senate to determine who should be recognized as empowered to represent and speak for Spain in the negotiation and execution of the treaty, and as they had recognized the King as possessing that power it was

not within the province of the courts to inquire whether they had erred in that regard. And in *Fellows* v. *Blacksmith,* 19 How. 366, 372, where a treaty with the New York Indians was asserted to be invalid on the ground that the Tonawanda band of Senecas was not represented in the negotiation and signing of the treaty, the Court disposed of that assertion by saying: " But the answer to this is, that the treaty, after executed and ratified by the proper authorities of the Government, becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operation than they can go behind an act of Congress." The propriety of this rule and the need for adhering to it are well illustrated in the present case, where the assault on the treaty cession is made seventy years after the treaty and forty years after the last instalment of the stipulated compensation of approximately $1,200,000 was paid to the Indians.

By the act of September 28, 1850, Congress granted to the several States the whole of the swamp lands therein then remaining unsold, c. 84, 9 Stat. 519. The first section was in the usual terms of a grant *in praesenti,* its words being that the lands described " shall be, and the same are hereby, granted." The second section charged the Secretary of the Interior with the duty of making out and transmitting to the governor of the State accurate lists and plats of the lands described, and of causing patents to issue at the governor's request; and it then declared that on the issue of the patent the fee simple to the lands should vest in the State. The third section directed that, in making out the lists and plats, all legal subdivisions the greater part of which was wet and unfit for cultivation should be included, but where the greater part was not of that character the whole should be excluded. The question soon arose whether, in view of the terms of the first and second sections, the grant was *in praesenti*

and took effect on the date of the Act, or rested in promise until the issue of the patent and took effect then. The then Secretary of the Interior, Mr. Stuart, concluded that the grant was *in praesenti* in the sense that the State became immediately invested with an inchoate title which would become perfect, as of the date of the Act, when the land was identified and the patent issued, 1 Lester's Land Laws, 549. That conclusion was accepted by his successors, was approved by the Attorney General, 9 Op. 253, was adopted by the courts of last resort in the States affected, and was sustained by this Court in many cases. *French* v. *Fyan,* 93 U. S. 169, 170; *Wright* v. *Roseberry,* 121 U. S. 488, 500, *et seq.; Rogers Locomotive Works* v. *Emigrant Co.,* 164 U. S. 559, 570; *Work* v. *Louisiana,* 269 U. S. 250. A case of special interest here is *Rice* v. *Sioux City & St. Paul R. R. Co.,* 110 U. S. 695. The question there was whether the Act of 1850 operated, when Minnesota became a State in 1858, to grant to her the swamp lands therein. The Court answered in the negative, saying that the Act of 1850 " operated as a grant *in praesenti* to the States then in existence," that it " was to operate upon existing things, and with reference to an existing state of facts," that it " was to take effect at once, between an existing grantor and several separate existing grantees," and that as Minnesota was not then a State the Act made no grant to her.

By the Act of March 12, 1860, c. 5, 12 Stat. 3, Congress extended the Act of 1850 to the new States of Minnesota and Oregon, the material terms of the extending act being as follows:

" That the provisions of the act [of 1850] be, and the same are hereby, extended to the States of Minnesota and Oregon: Provided, That the grant hereby made shall not include any lands which the government of the United States may have reserved, sold, or disposed of (in pursuance of any law heretofore enacted) prior to the con-

firmation of title to be made under the authority of the said act.

" Sec. 2. That the selection to be made from lands already surveyed in each of the States including Minnesota and Oregon, under the authority of the act aforesaid, . . . shall be made within two years from the adjournment of the legislature of each State at its next session after the date of this act; and, as to all lands hereafter to be surveyed, within two years from such adjournment, at the next session, after notice by the Secretary of the Interior to the governor of the State, that the surveys have been completed and confirmed."

The words " be, and the same hereby are, extended " in the principal provision and the words " the grant hereby made " in the proviso signify an immediate extension to these new States of the grant *in praesenti* made to other States in 1850. Other parts of the proviso signify an exclusion of particular lands from the grant as extended, but not a change in its nature. Indeed, if the grant as extended were regarded as taking effect only on the issue of the patent, the proviso would be practically an idle provision; while if the grant be regarded as *in praesenti*, like the original, the proviso serves a real purpose. Of course, the principal provision and the proviso are to be read together and taken according to their natural import, if that be reasonably possible—and we think it is. Thus understood, they show that Congress, while willing and intending to extend to these new States the grant *in praesenti* made to other States in 1850, was solicitous that the reservation, sale and disposal of lands (pursuant to laws in existence at the date of the extension) should not be interrupted or affected pending the identification and patenting of lands under the grant, and that the proviso was adopted for the purpose of excluding from the grant as extended all lands which might be reserved, sold or disposed of (in pursuance of any law

theretofore enacted) prior to the confirmation of title under the grant—the confirmation being the issue of patent. Many acts of that period granting lands in words importing a present grant—where the lands were to be afterwards identified under prescribed directions—contained provisions excluding lands that might be disposed of in specified ways before the identification was effected. But those provisions never were regarded as doing more than excepting particular lands from the grants; and, unless there were other provisions restraining the words of present grant, the grants uniformly were held to be *in praesenti,* in the sense that the title, although imperfect before the identification of the lands, became perfect when the identification was effected and by relation took effect as of the date of the granting act, except as to the tracts falling within the excluding provision. *St. Paul & Pacific R. R. Co.* v. *Northern Pacific R. R.,* 139 U. S. 1, 5; *Missouri, Kansas and Texas Ry. Co.* v. *Kansas Pacific Ry. Co.,* 97 U. S. 491, 497; *Schulenberg* v. *Harriman,* 21 Wall. 44, 60–62.

The Act of 1860 was construed as we here construe it by Secretary Delano in 1874, 1 Copp's P. L. L. 475, and by Secretary Schurz in 1877, 2 *id.* 1081; and their construction was adopted and applied by their successors up to the time of this suit,* and was approved by the Attorney General in 1906, 25 Op. 626. So, even if there were some uncertainty in the Act, we should regard this long-continued and uniform practice of the officers charged with the duty of administering it as persuasively determinative of its construction. *United States* v. *Burlington and Missouri River R. R. Co.,* 98 U. S. 334, 341; *Schell's Executors* v. *Fauche,* 138 U. S. 562, 572; *Louisiana* v. *Garfield,* 211 U. S. 70, 76; *United States* v. *Hammers,* 221 U. S. 220, 228; *Logan* v. *Davis,* 233 U. S. 613, 627.

---

* 3 L. D. 474, 476; 22 *id.* 388; 27 *id.* 418; 32 *id.* 65, 328; 37 *id.* 397.

While the grant as extended to Minnesota was a grant *in praesenti*, it was restricted to lands which were then public. The restriction was not expressed, but implied according to a familiar rule. That rule is, that lands which have been appropriated or reserved for a lawful purpose are not public and are to be regarded as impliedly excepted from subsequent laws, grants and disposals which do not specially disclose a purpose to include them. *Wilcox v. Jackson,* 13 Pet. 498, 513; *Leavenworth, Lawrence & Galveston R. R. Co.* v. *United States,* 92 U. S. 733, 741, 745; *Missouri, Kansas & Texas Ry. Co.* v. *Roberts,* 152 U. S. 114, 119; *Scott* v. *Carew,* 196 U. S. 100. Thus the general words of the Acts of 1850 and 1860 must be read as subject to such an exception, *Louisiana* v. *Garfield, supra,* p. 77.

The 706 acres, before described as within the Leech Lake, Winnibigoshish and Cass Lake reservations as originally created, were not public lands when the grant was extended to the State, but were then reserved and appropriated for the use of the Chippewas, and so were excepted from the grant. Probably the patenting of them to the State was a mere inadvertence, for it was not in accord with rulings of the Secretary of the Interior on the subject. But, be that as it may, the patenting was contrary to law and in derogation of the rights of the Indians under the Act of 1889. Therefore, the United States is entitled to a cancellation of the patents as to these lands, unless the State has sold the lands, and in that event is entitled to recover their value.

The 152,124.18 acres, before described as within the cession of 1855, were not reserved or otherwise appropriated when the grant was extended, but were then public lands; and, being swampy in character, they were included in the grant and rightly patented under it, unless there be merit in some of the contentions on the part of the United States which remain to be considered.

It is said that these lands, although public when the grant was extended, were afterwards reserved and appropriated for the use of the Chippewas by treaties made before the title under the grant was confirmed by the issue of patents, and that this brought the lands within the exception made by the proviso. The contention appears to be in direct conflict with the words of the proviso which limit the exception made therein to lands reserved, sold or disposed of in pursuance of laws enacted before the grant was extended. But, by way of avoiding this conflict, it is said that the treaties were made in the exercise of a power conferred by the Constitution, which is a law adopted before the extension, and therefore that the lands must be held to have been reserved and appropriated in pursuance of a prior law in the sense of the proviso. We assent to the premise, but not to the conclusion. The words of the proviso are "in pursuance of any law heretofore enacted." We do not doubt that, rightly understood, they include a prior treaty as well as a prior statute. But we think it would be a perversion of both their natural import and their spirit to hold that they include either a subsequent treaty or a subsequent statute. Of course, all treaties and statutes of the United States are based on the Constitution; and in a remote sense what is done by or under them is done under it. But lands are never reserved, sold or disposed of directly under the Constitution, but only in pursuance of treaties made or statutes enacted under it. The words, "heretofore enacted," in the proviso are words of limitation and can not be disregarded. They show that it is not intended to have the same meaning as if it said, "in pursuance of any law," and that what it means is any treaty or statute theretofore made or enacted.

It next is said—assuming the grant was *in praesenti* and included these lands—that in virtue of the treaty-making power the United States could, and did by the

treaties of 1863, 1865 and 1867, divest the State of her right in the lands and appropriate them to the use and benefit of the Chippewas. The decisions of this Court generally have regarded treaties as on much the same plane as acts of Congress, and as usually subject to the general limitations in the Constitution; but there has been no decision on the question sought to be presented here. The case of *Rice* v. *Minnesota & Northwestern R. R. Co.,* 1 Black 358, is cited as giving some color to the contention; but in so far as it has a bearing it tends the other way. The controversy there was over the validity of an act of Congress repealing a prior act making a grant of lands to the then Territory of Minnesota in aid of the construction of a proposed railroad. The granting act, while containing words of present grant, declared that "no title" should pass to the Territory until a designated portion of the road was completed, and also that the lands should not inure to the benefit of any company constituted and organized prior to the date of that act. The Territory, anticipating a grant in aid of the undertaking, already had attempted to transfer her rights under the grant to a company incorporated theretofore; and the litigation was with that company. The repealing act was passed less than two months after the granting act and before the construction of the road was begun. The Court held that the grant was not *in praesenti,* because the words of present grant were fully overcome by other provisions; and also that the repealing act was valid, because no right had passed to the Territory or the company up to that time. But the Court deemed it proper to say (p. 373) that if the granting act had passed a present right, title or interest in the lands, the repealing act would be "void, and of no effect"; and also (p. 374) that if the granting act had operated to give to the Territory a beneficial interest in the lands, it was "clear that it was not competent for Congress to pass the repealing act and divest the title."

But if the treaty-making power be as far reaching as is contended—which we are not now prepared to hold—we are of opinion that no treaty should be construed as intended to divest rights of property—such as the State possessed in respect of these lands—unless the purpose so to do be shown in the treaty with such certainty as to put it beyond reasonable question. And, of course, the rule before stated, that where lands have been appropriated for a lawful purpose they are to be regarded as impliedly excepted from subsequent disposals which do not specially include them, applies to treaty disposals as well as to statutory disposals.

On examining the treaties we do not find anything in them which may be said to be certainly indicative of a purpose to divest the State of her right to these lands. The areas reserved by the treaties were described in general terms—as by indicating the exterior boundaries or designating the area as a stated number of townships around a particular lake. The areas were very large— one comprising more than a million acres. No doubt the descriptions were sufficient to carry the whole of each area, if free from other claims; but there was nothing in them or in the other provisions signifying a purpose to disturb prior disposals or to extinguish existing rights under them. True, it was said that the reservations were established as "future homes" for the Indians; but this meant that the Indians were to live within the reservations, and did not have reference to any particular lands within their limits. The areas were vastly in excess of what would be needed for individual homes and farms, and included many lands wholly unfit for that purpose. The areas were dotted with lakes—some navigable—and with swamps—some almost impassable. In short, it is apparent that the treaties dealt with extensive areas in a general way and not with particular lands in a specific way. So we think they must be read as impliedly ex-

100569°—26——14

cepting the swamp lands theretofore granted to the State and leaving her right to them undisturbed.

The case of *Minnesota* v. *Hitchcock*, 185 U. S. 373, is cited as making for a different conclusion; but it does not do so. The question there was whether the State was entitled, under the school land grant, to sections 16 and 36 in the part of the Red Lake reservation which was ceded under the Act of 1889. That grant was expressed in words of promise, not of present grant. Title was to pass when the lands were identified by survey, if they were then public; and if at that time they were not public but otherwise disposed of, the State was to be entitled to other lands in their stead. The lands in question never had been public; and their cession under the Act of 1889 was not absolute or unqualified but in trust that they be sold as provided in that act for the benefit of the Indians. After that cession the lands in the ceded part of the reservation were surveyed and the government officers took up the task of selling them in pursuance of the trust. The State then sued to establish her claim to sections 16 and 36 and to prevent their sale. The Court ruled against the State, and the following excerpt from the opinion (p. 393) discloses the grounds on which the decision proceeded:

" Congress does not, by the section making the school land grant, either in letter or spirit, bind itself to remove all burdens which may rest upon lands belonging to the Government within the State, or to transform all from their existing status to that of public lands, strictly so called, in order that the school grant may operate upon the sections named. It is, of course, to be presumed that Congress will act in good faith; that it will not attempt to impair the scope of the school grant; that it intends that the State shall receive the particular sections or their equivalent in aid of its public school system. But considerations may arise which will justify an appropriation

of a body of lands within the State to other purposes, and if those lands have never become public lands the power of Congress to deal with them is not restricted by the school grant, and the State must seek relief in the clause which gives it equivalent sections."

It further is said that, assuming the State was entitled to these lands, she lost her right by failing to make selection of them within the prescribed period after they were surveyed. There is no merit in this contention. It rests on a misconception of what constitutes a selection in the sense of the requirement in the second section of the Act of 1860, before quoted. The earlier statute of 1850, in its second section, charged the Secretary of the Interior with the duty of making out and transmitting to each State accurate lists of the lands falling within the grant; and to do this it was necessary that he determine which lands were swampy and which not swampy. The Act said nothing about the evidence on which his determination should be based or the mode of obtaining the evidence. In taking up the administration of the grant, the Secretary accorded to each State a choice between two propositions: first, whether she would abide by the showing in the government surveyor's field notes; and, second, if the first proposition was not accepted, whether she would through her own agents make an examination in the field and present claims for the lands believed to be swampy accompanied by proof of their character. Some of the States elected to abide by the surveyor's field notes and others elected to take the other course. In the administration of the grant these elections were respected and given effect, save as there were some merely temporary departures. Where the election was to abide by the field notes that, without more, was regarded a continuing selection by the State of all lands thus shown to be swampy. Where the election was to take the other course the presentation of claims with supporting proofs was

regarded as a selection by the State. This was the settled practice when the Act of 1860 was passed; and the provision in its second section requiring that selection be made within a designated period is to be construed in the light of that practice. Neither that act nor the one of 1850 contained any other provision which reasonably could be said to require a selection by the State. Possibly the provision in the second section of the Act of 1850 requiring the Secretary to make out and transmit to each State accurate lists of the lands falling within the grant might be said to lay on him a duty to make selections. But, if this was the selection meant by the second section of the Act of 1860, the States could not be charged with any dereliction or neglect by reason of his delay. But we think it meant a selection by the State as that term was understood in the administrative practice. There had been objectionable delay prior to the Act of 1860 on the part of some of the States in carrying out their election to make examinations in the field and present claims with supporting proof; and the second section of that Act shows that it was specially directed against unnecessary delay in making that kind of selections. It evidently was intended to accord to those States reasonable opportunity for making necessary appropriations and to require that they then proceed diligently with the examinations in the field and the presentation of their claims and proofs.

Shortly after the Act of 1860 the propositions theretofore submitted to other States were submitted to Minnesota by the Secretary's direction in a letter from the Commissioner of the General Land Office. After stating the propositions the Commissioner said: " By the adoption of the first proposition the State will receive all the lands to which she is justly entitled, as the field notes of the survey are very full in characterizing or giving descriptions to the soil; and an important reason for doing so is

that she will incur no expense in selecting or designating the lands." By an act of her legislature, passed in 1862, Minnesota elected to abide by the surveyors' field notes; and her Governor promptly notified the Commissioner and the Secretary of that election. It has been respected and given effect, with one temporary interruption, and has been treated as a continuing selection by the State of all lands shown by the surveyor's field notes to be swampy. 2 Copp's P. L. L. 1034; 32 L. D. 65, 533–535. In 1877 Secretary Schurz, in overruling a contention like that we now are considering, held that the action of the state legislature in 1862, was an effective selection. 2 Copp's P. L. L. 1081. Similar contentions were pronounced untenable by the Attorney General in 1906, 25 Op. 626, and by the Secretary of the Interior in 1909, 37 L. D. 397. On principle, as also out of due regard for the administrative practice, we think the election by the state legislature, approved by the Governor as it was, was a timely and continuing compliance with the requirement in the second section of the Act of 1860. What would have been the effect of a failure to comply with that requirement we need not consider here.

The further contention is made that the State before the issue of the patents forfeited her right to receive them by disabling herself, through an amendment to her constitution, from complying with the provision in the Act of 1850 directing that the lands passing to the State under the grant, or the proceeds of their sale, "be applied, exclusively, as far as necessary," in effecting their reclamation by means of needed levees and ditches. The State did declare in an amendment to her constitution, adopted in 1881, that the lands should be sold and the proceeds inviolably devoted to the support and maintenance of public schools and educational institutions; but it does not follow that she disabled herself from reclaiming the lands or formed or declared a purpose not to re-

claim them. On the contrary, her statutes enacted since the amendment and the published reports of her officers show that she adopted and proceeded to carry out extensive reclamation plans applicable to all swamp lands within her limits, that she and her municipal subdivisions expended many millions of dollars in this work, and that they are still proceeding with it. But, apart from this, the contention must fail. It rests on an erroneous conception of the effect and operation of the provision relied on, as is shown in repeated decisions of this Court. We think it enough to refer to *United States* v. *Louisiana*, 127 U. S. 182, for the controversy there was between the United States, the grantor, and one of the States to which the grant was made. The Court cited and reviewed the earlier cases and then said (p. 191): " Under the Act of 1850, the swamp lands are to be conveyed to the State as an absolute gift, with a direction that their proceeds shall be applied exclusively, as far as necessary, to the purpose of reclaiming the lands. The judgment of the State as to the necessity is paramount, and any application of the proceeds by the State to any other object is to be taken as the declaration of its judgment that the application of the proceeds to the reclamation of the lands is not necessary." And also (p. 192): " If the power exists anywhere to enforce any provisions attached to the grant, it resides in Congress and not in the court." The same principles have been applied in later and related cases. *Stearns* v. *Minnesota*, 179 U. S. 223, 231; *Alabama* v. *Schmidt*, 232 U. S. 168; *King County* v. *Seattle School District*, 263 U. S. 361, 364.

Finally much stress is laid on the provisions of the Act of 1889, the cession under it, and resulting rights of the Indians and obligations of the United States. But it suffices here to say that the Act of 1889 was without application to lands in which the Indians had no interest, that the cession under it was only of lands in which they had

an interest, and that the resulting rights of the Indians and obligations of the United States were limited accordingly.

Our conclusion on the whole case is that the bill must be dismissed on the merits as to all the lands, excepting the 706 acres described as within the Leech Lake, Winnibigoshish and Cass Lake reservations as defined and existing in 1860, and that as to them the United States is entitled to a decree canceling the patents for such as have not been sold by the State and charging her with the value of such as she has sold. By reason of the relation in which the United States is suing, the value should be determined on the basis of the prices which would have been controlling had the particular lands been dealt with, as they should have been, under the Act of 1889, *United States* v. *Mille Lac Chippewas, supra,* 510.

The parties will be accorded twenty days within which to suggest a form of decree giving effect to our conclusions and to present an agreed calculation of the value of so much of the 706 acres as has been sold.