Williams, Judge,
delivered the opinion of the Court:
This suit is brought under the jurisdictional act of May 24, 1924, 43 Stat. 139, which confers jurisdiction upon the *167 Court of Claims to hear, examine, adjudicate and render judgment “ in any and all legal and equitable claims arising under or growing out of any treaty, or agreement between the United States * * * ” and the plaintiff Indians, “ or arising under or growing out of any act of Congress in relation to Indian affairs * * * ” which “ have not been heretofore determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States,” excepting only “the so-called loyal Creek ” claims or any claims with reference to the equalization of allotments heretofore made to the members of the Creek Nation.
By a subsequent enactment, 44 Stat. 568, plaintiff was authorized to prosecute its claim in a single suit or bring a separate suit on one or more of such claims. This is one of a series of suits brought under the authority of these acts.
Under the treaty of February 14, 1883, 7 Stat. 417, the United States granted to the Creek Nation, in fee simple, a large tract of land in the then Indian territory. Subsequently, under the treaty of June 14, 1866, 14 Stat. 785, the Creek Nation ceded back to the United States the entire west half of this tract, to be divided by a line running north and south, which was to be surveyed under the direction of the Commissioner of Indian Affairs.
By the treaty of February 18, 1867, 15 Stat. 495, the United States ceded to the Sac and Fox Indians a tract of land not exceeding 750 square miles in Indian territory south of Kansas. The lands given were to be selected under the direction of the Secretary of the Interior, and were to be surveyed as to their exterior boundary at the expense of the United States. It developed that the lands selected for the Sac and Fox Reservation lay within that part of the Creek domain ceded to the United States under the treaty of June 14, 1866.
In August 1871 the official survey of the Creek lands was made pursuant to the provisions' of the treaty of June 14, 1866, by one Frederic W. Bardwell, who ran and established the line dividing that portion of the Creek domain ceded by the Creek Nation to the United States from that *168 portion of the domain retained by it. It developed later, and is now conceded, that the line as surveyed and run by Bardwell was erroneous, in that it was not a true north and south line as contemplated and required by the treaty, and that land not ceded by the Creek Nation to the United States was included in land lying west of the line. This error, however, has no bearing on the case as the Creek Nation, by the agreement of January 19,1889, 25 Stat. 757, ratified and confirmed the line as run by Bardwell, and ceded to the United States, without reservation or condition, full and complete title to all that part of its former domain lying west of the line established by Bardwell. The Bardwell line, therefore, although erroneous, became the boundary line between the Creek Nation on the east and the Sac and Fox Nation on the west, and by the act of May 2, 1890, 26 Stat. 81, was designated as the boundary line between the Creek Nation and the new territory of Oklahoma.
Pursuant to the provisions of the treaty of February 18, 1867, a survey of the Sac and Fox Reservation was made by one E. N. Darling in 1872, who divided the land into sections. Darling erroneously ran his division lines into the Creek domain and his closing corners were placed some distance to the east of the Bardwell line and upon land owned by the Creek Nation. As a result of this survey 5,575.57 acres of Creek lands were erroneously included in the Sac and Fox Reservation. In 1876 one Hackbusch resurveyed Darling’s section lines, and in addition thereto subdivided the sections into 40-acre tracts. In this survey he perpetuated the errors of Darling by extending his survey east of the Bardwell boundary line into the Creek Nation. The Darling and Hackbusch surveys were ajiproved by the Commissioner of the General Land Office on February 15, 1873, and September 10, 1875, respectively, apparently without discovery of the errors therein.
By article I of the agreement of June 12,1890, between the United States and the Sac and Fox Nation, as set forth in the act of Congress of February 13, 1891, 26 Stat'. 749, the Sac and Fox Nation ceded all its lands to the United States. It was provided in the agreement that after certain allotments had been made t'o the Sac and Fox Indians and pro *169 visional patents had been issued therefor, the residue of the land ceded should become public lands of the United States, and under such restrictions as may be imposed by law, be subject to white settlement. The 5,575.57 acres of land erroneously included in the Sac and Fox Reservation by the Darling survey were, under the aforesaid agreement and act of Congress, opened to settlement in September 1891, and patents to settlers thereon were subsequently issued by the United States. The original settlers, or persons holding title through them, are now in possession of the land.
Following the opening of the land to settlement and the issuing of patents to settlers thereon, numerous complaints were made to the Indian Office and to the General Land Office as to the conflicting claims of homesteaders, Creek Indian allottees, and others, in respect to titles to the land, especially those lands lying in that part of the area involved where patents to the same tracts were issued to homesteaders, and allotments were made to citizens of the Creek Nation. The United States Geological Survey, in 1895 and 1896, resurveyed the west boundary of the Creek Nation and reestablished the original boundary line as surveyed by Bardwell in 1871. From these surveys the errors made by Darling in his survey of the Sac and Fox Reservation in 1873 clearly appeared, and the fact was established that the 5,575.57 acres of land in question had erroneously been included in that reservation. The Creek Nation, from that time until now, has continuously and persistently asserted its right and title to the land, and has repeatedly urged before Congress its right to be restored to the possession of the same.
Up to this point in the case the plaintiff and the defendant are in substantial agreement. They agree that the 5,575.57 acres of land involved lie between the Bardwell line on the west and the Darling line on the east; that it was erroneously included as a part of the Sac and Fox Reservation by Darling in his survey, and that the plaintiff is entitled to compensation for the value of the land. The real issue between them is the question of the value of the land. The determination of this question hinges entirely upon the date at *170 which such value is rightly computable. The ascertainment of this date, therefore, is the first question for decision.
The plaintiff contends that it was given fee simple title to the land under the treaty of February 14, 1833; that it has never been divested of its title to the land; that it is the owner of the land at this time, and that under the jurisdictional act, referring its claim to this court, it is entitled to recover the value of the land as of the date of the filing of the petition herein.
The defendant’s contention as stated in the brief is:
“ If — and such appears to be the fact — in the area shown by the Darling survey as part of the Sac and Fox domain, land was included which as a matter of fact rightfully belonged to the Creek Nation, it is submitted that by the act of the Commissioner of the General Land Office on February 15, 1873, in approving the erroneous Darling survey, such land was on that date ‘ taken ’ by the United States. However wrongful this £ taldng ’ may have been, it conclusively appears that it occurred on February 15, 1873.
“ It is further submitted that, through the approval of the Darling survey on February 15, 1873, by the Commissioner of the General Land Office, all land included within the area shown by this survey of necessity thereupon became the property of the Sac and Fox Nation.”
The defendant makes the further contention:
“ It may here be observed that in the event there should be any doubt as to- whether or not the land involved herein was ‘ taken ’ by the United States in 1873 through the act of the Commissioner of the General Land Office in approving the Darling survey — there can not be any doubt whatsoever that this land was either acquired from the Sac and Fox Nation, or ‘taken’ from the Creek Nation, by the United States through the act of Congress approved on February 13, 1891. Indeed, insofar as the land in question herein is concerned, it may be said that there cannot be the slightest doubt that Congress by its act approved on February 13, 1891, intended to accomplish and did accomplish one of two measures in respect of this land: (a) ratified and confirmed the act of the Commissioner of the General Land Office in 1873 in approving the Darling survey, and the United States acquired title to this land from the Sac and Fox Nation; or (b) assuming that the Sac and Fox Nation had no right whatsoever to cede this land to the United States, ratified and confirmed the act of the *171 Commissioner of the General Land Office of 1873 in approving the Darling survey, and thus £ took ’ the land in question from the Creek Nation.”
The defendant cites no authority in support of the contention that the act of the Commissioner of the General Land Office in 1873, in approving the erroneous Darling survey, operated to divest the plaintiff of its title to the land involved, and to vest title thereto in the Sac and Fox Nation, and we know of no authority that does support it. There is nothing in the language of the treaty of 1867 (15 Stat. 495), under which the United States ceded to the Sac and Fox Nation its reservation, indicating an intention on the part of the Government to include in the grant the land involved in suit, or any land other than such as was then owned by the United States. Even if this land had been within the territorial limits of the grant, it would under a well established rule of law have been impliedly excepted as coming within the terms of the grant, in the absence of specific language leaving no room for doubt as to the intention of the United States to include it as a part of such grant. Wilcox v. Jackson, 13 Pet. 498; Leavenworth, Lawrence & Galveston R.R. Co. v. United States, 92 U.S. 733; United States v. Minnesota, 270 U.S. 181. This being true, can it be maintained that the act of the Commissioner of the General Land Office, in approving an erroneous survey, including the 5,575.57 acres as a part of the land granted to the Sac and Fox Nation, operated ipso facto to divest the plaintiff of its title to the land and vest title to the same in the Sac and Fox Nation? In other words, did the administrative act of the Commissioner of the General Land Office in approving an erroneous survey divest the plaintiff of its fee title to the land involved — a thing that Congress itself could only do, and that by the use of specific language leaving no room for doubt as to its intention? We think not.
The act of February 13, 1891, ratified and confirmed an agreement between the United States and the Sac and Fox Indians in which they ceded all their lands to the United States. Article I of the agreement described the land ceded *172 by metes and bounds, the west boundary line of the Creek Reservation being designated as one of the boundaries of the area ceded. It is not contended that the 5,575.57 acres of land involved in this suit come within the limits of the area thus described, as this land lies east of the Creek1 Nation’s western boundary line. It is claimed, however, that such land comes within the cession of Sac and Fox lands by virtue of the following language appearing at the conclusion of the precise description by metes and bounds of the land ceded:
“And all other land or country in Indian Territory, in which said Sac and Fox Nation has or claims any title, claim or interest.”
It is obvious that the purpose of incorporating this general language in the agreement following the particular designation of the lands ceded was to protect the United States against any and all future claims of the Sac and Fox Indians growing out of the sale and transfer of their lands to the United States. The effect of the language used was to estop the Sac and Fox Nation from asserting at some future date claim of title or right in any lands in the Indian Territory other than those designated in the agreement. The contention, therefore, that by virtue of this language the United States acquired title to any land not then the property of the Sac and Fox Nation, merely because that Nation claimed some title or interest therein, can not be sustained. At most the United States acquired only such title in the 5,575.57 acres of land involved as the Sac and Fox Nation itself had in the land. The fee title to the land then being in the plaintiff, the United States under the act of February 13, 1891, acquired no title or interest in the land, other than the unfounded claim of the Sac and Fox Nation to the land, arising out of its occupancy of the same under the erroneous Darling survey.
We hold therefore, that neither the treaty of 1867 under which the United States granted the Sac and Fox Nation its reservation, nor the action of the Commissioner of the General Land Office in 1873 in approving the erroneous *173 survey of that reservation, nor the act of February 13, 1891, under which the Sac and Fox Nation ceded its lands to the United States, and 'under the provisions of which the 5,575.57 acres of land were opened to settlement, divested the plaintiff of its title to the land or its rights to the possession thereof; that neither the United States nor the Sac and Fox Nation acquired any right, title, or interest in or to the said land by virtue of any of the agreements or acts of Congress aforesaid, or by or through the action of the Commissioner of the General Land Office in approving the erroneous survey of 1873. It follows that the plaintiff was the owner of the land when it was opened to settlement under the proclamation of the President, September 18, 1891. The Government of the United States had no title to it, and therefore its patents to settlers thereon did not operate to convey the land.
The conclusions just stated are supported by the affirmative declarations by Congress, in acts approved both before and after the land was opened to settlement in 1891, that the Bardwell line was the west boundary line of the Creek Nation. The first of these acts, the act of March 1, 1889, has already been referred to as definitely fixing the original Bardwell line as the western boundary of the Creek Nation. While the errors made by Darling in his survey of the Sac and Fox Beservation were apparently not known at the time of this enactment, we do not regard that fact as material. The Creek Nation for several years had been pressing a claim against the Government for reimbursement for lands alleged to have been lost to it through the error of Bardwell in establishing the division line in 1871. Congress taking cognizance of this claim, in the act of March 3, 1885, 23 Stat. 362, provided that the Creek Nation should within twelve months, and in pursuance of a resolution of its national council first had and obtained, make and file in the office of the Secretary of State an acceptance and ratification of the Bardwell survey made and approved by the department under the treaty of June 14, 1866. The acceptance of this statutory mandate by the Creek Nation was effectuated by the act of March 1, 1889, supra.
*174 Congress again in the act of June 21, 1906, declared the Bardwell line to be the western boundary line of the Creek Nation, using the following explicit language:
“ That the boundary line between the Creek Nation, Indian Territory, and the Territory of Oklahoma, as surveyed by Frederic W. Bardwell in eighteen hundred and seventy-one, and reestablished by the Geological Survey in eighteen ninety-six is hereby declared to be the west boundary line of the Creek Nation.”
This act was passed more than 30 years after the approval by the Commissioner of the General Land Office of the survey of the Sac and Fox Reservation, and more than 14 years after the 5,575.57 acres of land in question had been opened to settlement. Congress at the time was fully informed as to all the facts relating to the plaintiff’s claim. The record discloses that committees of both the Senate and the House had repeatedly made exhaustive investigations as to every phase of the controversy. Numerous reports dealing with the matter, made from time to time by Commissioners of Indian Affairs, Secretaries of the Interior and other administrative officials of the Government were considered by Congress. It is significant that no official of the Indian Office, of the General Land Office, or of the Department of the Interior having to do with these matters ever questioned the right or title of the Creek Nation in, or to, these lands, or ever asserted that the United States had title to them at the time they were opened to settlement in 1891. On the contrary they, without exception, advised Congress that title to the land was in the Creek Nation and that settlers on the land, to whom patents had been issued, acquired no title to the land thereunder. The Commissioner of Indian Affairs in a report to the Secretary of the Interior, August 7, 1903, said:
“ The Government of the United States is not a guarantor of the area within any description of land patented by it under the laws of the United States * * *. At the time the patents: were issued, the land was a part of the property of the Creek Nation. The Government of the United States had no title to it, and therefore its patent did not operate to convey the land.”
*175 The Secretary of the Interior in a report to Congress on April 9, 1906, said:
“ The homestead claimants have no legal title to the land in the Creek Nation east of the Bar dwell line patented to them, and * * * ”
The Secretary of the Interior in this report recommended to Congress that the 5,575.57 acres be appraised at their cash value and that payment therefor be made to the Creek Nation.
Under these circumstances, and with the undoubted intent and purpose of settling definitely all questions growing out of the various treaties, statutes, and administrative acts of officials of the Indian Office and the General Land Office dealing with the title to the land in controversy, Congress again, as it had done in the acts of March 8, 1885, March 1, 1889, and May 2, 1890, declared the Bardwell line to be the western boundary of the Creek Nation. The act of June 21, 1906, must be regarded as conclusive as to the Creek Nation’s right and title to the land in controversy as of that date. The act clearly contemplated the restoration of the land to the Creek Indians through appropriate administrative action. The patents issued to settlers for the land being void, it was within the power of the Government to secure their cancellation, United States v. Minnesota, 270 U.S. 181, and to restore the land to the plaintiff. Government officials having charge of the affairs of the Creek Nation took no steps to have the erroneous patents canceled and possession of the land restored to the plaintiff after the passage of the act of June 21, 1906, and the matter was allowed to drift until May 24, 1924, when jurisdiction was conferred on this court to “ hear, examine and adjudicate and render judgment ” on the plaintiff’s claim.
The plaintiff being the owner of the land, is legally and equitably entitled to be placed in possession of it. The court, however, is without authority to put the plaintiff in possession of the land, and has jurisdiction only to render a money judgment for its value. This being true, we think the plaintiff is entitled to judgment for the value of the land as of the date of the institution of this'suit, July 3, 1926. *176 Its fee simple title to the land held for more than ninety years has never been extinguished. It was the owner of the land on the date of the institution of its suit, and is the owner of the land now. That it has long been denied the right to possess and occupy the same does not in any way affect its title to the land or its right to be restored to the possession of the same. Plaintiff is now suing to recover the value of the lands which it owned in fee on the date of the filing of its suit. Certainly a judgment of the court based on the 1873 or the 1891 value would not give the plaintiff either legal or equitable compensation for the land. We hold, therefore, that the plaintiff is entitled to recover the value of the land as of the date of the bringing of its suit. It has been within the power of the Government, at all times since the erroneous inclusion of the plaintiff’s land in the Sac and Fox Reservation, and since it was erroneously opened to settlement and patented to homesteaders in 1891, to have the value of the lands appraised and to pay for the same by direct appropriation by Congress, or to, by an appropriate jurisdictional act, authorize the plaintiff to bring suit on its claim and have the value of the lands in controversy judicially determined. Had the Government pursued either of these courses the plaintiff would have been entitled to receive and would have received the value of its lands as of the date of its compensation for them. However, nothing was done to right the great wrong perpetrated upon the plaintiff, by the repeated errors of the Government, until it was given the right to bring suit in this court under the act of May 24, 1924. We think, therefore, the plaintiff is entitled as a matter of law, as well as in equity and good conscience, to- receive the value of its lands as of the date of the bringing of its suit.
The value of the land involved is entirely a question of fact to be determined by the evidence. We have found the value of the land for all purposes, including its surface, lease, and royalty values, is $30 per acre.
A tract consisting of 170.49 acres was located in the extreme southern part of the 5,575.57-acre tract. Of this 170.49-acre tract 118.4 acres were patented to settlers and were also subsequently allotted to members of the Creek *177 Tribe. Deeds for the entire 118.4 acres were made by chiefs of the Creek Nation to individual Indian allottees, and were duly approved by the Secretary of the Interior. The Creek Nation having divested itself of title to this 118.4 acres of land cannot maintain suit for recovery of the value of the same under the jurisdictional act of May 24, 1924.
The remaining 52.09 acres of the 170.49-acre tract were sold as unallotted land of the Creek Nation. The Creek Nation, however, has received no money for any part of the 52.09 acres so sold, except 2.88 acres sold to James H. Kean. The defendant is entitled to credit for this 2.88-acre tract, making a total of 121.28 acres out of the 5,575.57 acres erroneously included in the Darling survey for which plaintiff cannot recover.
Plaintiff, therefore, is entitled to recover the sum of $163,628.70, the value of 5,454.29 acres, less the amount the defendant is entitled to recover on its counterclaim, which will next be considered.
DEFENDANT’S OOXTNTERCnAIM
Pursuant to article 2 of the treaty of March 24, 1832, 7 Stat. 366, 20 sections of land within Benton and Chambers Counties, Alabama, were reserved for the “ orphan children of the Creeks.” The act of March 3, 1837, 5 Stat. 186, authorized the President to sell the land, and if he thought proper, to invest the whole or any part of the purchase money in stocks, and to pay the interest to the persons entitled thereto. Pursuant to the act, the land in question was sold and the proceeds realized therefrom invested in interest-bearing State bonds. The principal of the fund thus created was carried on the books of the United States Treasury under the heading “ Creek orphan fund ” and the interest thereon was carried under the heading “Interest on Creek orphan fund.”
It was claimed by the Creek Nation at various times subsequent to the establishment of the aforesaid Creek orphan fund that certain disbursements from the interest thereon were made for purposes not contemplated by the treaty of 1832. Finally it was determined by Congress in 1882 that *178 there had been expended without authority of law, and without the consent of the Creek orphans, $69,956.68 for general purposes of the Creek Nation, and $106,799.68 for support of loyal refugees of the Creek Nation during and following the Civil War.
By the act of August 7, 1882, 22 Stat. 301, the aforesaid sum amounting to $176,755.97, with interest thereon from April 6, 1872, was appropriated for the purpose of reimbursing the Creek orphan fund for the sums thus improperly disbursed. By the said act it was provided:
“ That the Secretary of the Interior is hereby authorized and instructed to charge the sum of sixty-nine thousand nine hundred and fifty-six dollars and sixty-eight cents, used for general purposes of the Creek Nation, against the general fund of said nation, and said sum shall be retained by the Secretary of the Interior in such installments as shall not seriously embarrass the object of the annual appropriations for the support and necessities of the Creek Nation; but nothing in this act contained shall be construed to prevent the United States from asserting its right to be reimbursed by the Creek Nation in any future settlements therewith the further sum of one hundred and six thousand seven hundred and ninety-nine dollars and sixty-eight cents, expended by the United States out of the Creek orphans fund for the support of loyal Creek refugees.”
The defendant has presented a counterclaim for the aforesaid expenditures, and asks that they be set off against the amount of judgment awarded to the plaintiff on its claim. The defendant is clearly entitled to recover on its counterclaim as to the $69,956.68 item. These funds were disbursed for general purposes of the Creek Nation and are proper charges to be made against it by the Government.
The report of the General Accounting Office in the case of The Creek Nation v. United States, H-510, shows that only $6,848.83 of the $106,603.29 disbursed from “ interest on the Creek orphan fund ” for the relief of refugee Indians during the years 1863 to 1867, was in fact expended for the benefit of the citizens of the Creek Nation, and that the balance thereof was expended for the benefit of members of other tribes of Indians. The sum expended by the United States for the care of refugee Creek Indians was an expenditure *179 properly chargeable to the Creek Nation, and the defendant is entitled to recover $6,848.83 on this item of its counterclaim.
Our conclusion therefore is, that the plaintiif is entitled to recover $163,628.70 on its petition. The defendant is entitled to recover the sum of $76,805.51 on the two items of its counterclaim.
The plaintiff is entitled to a judgment in the sum of $86,823.19, and judgment in that amount is hereby ordered to be entered.
Whaley, Judge; LittletoN, Judge; and GREEN, Judge, concur.
Booth, Chief Justice, took no part in the decision of this case on account of illness.