LEMIEUX and others, Appellants, vs. AGATE LAND
COMPANY and another, Respondents.

*May 7—June 20, 1927.*

*Public lands: Validity of homestead entries: Decision of land office:
Adverse possession: Laches: Indian tribal right: Termination
of occupancy by executive order: Lands held by member of
tribe.*

1. Where an application in 1854 for a patent to land under the
   federal Pre-emption Act of 1841 was delayed at first because
   of an executive order declaring an intention to reserve part
   of such land for military purposes and later because of other
   applications for the same land, one of which was by plaintiffs'
   ancestor, under the act of Congress of February 8, 1887, seek-
   ing land under rights as an Indian of the half blood, the de-
   cision of the Department of the Interior, after full opportu-
   nity for hearing thereon, followed by a patent to the original
   entrant in 1891, ended any question as to the original home-
   stead entry.  p. 470.

2. Homestead entries to public land made in 1854, after a survey
   but before the map was filed, are not invalid as premature,
   where the record shows that the government survey was made
   of land open to occupancy, and the survey thereof was filed
   in 1853; and the United States only could assert any such con-
   tention if it had any weight.  p. 471.

3. In an action to assert title and recover possession of land, evi-
   dence which fails to show inclosure by fence or other recog-
   nized form for asserting title or right as to land as a whole
   is *held* insufficient to show title by adverse possession either
   in plaintiffs' own right or that of their ancestor.  pp. 471, 472.

4. Adverse possession cannot be successfully asserted in public
   lands prior to the issuance of patents, since that would be the
   assertion of a claim of right against the sovereign.  p. 472.

5. Where an application for a homestead patent was made in 1854
   and a patent thereon issued in 1891 to the original entrant,
   delay of the claimants until 1919 in asserting a claim of ad-
   verse possession, in the face of the known occupancy of the
   land by others in reliance on the record title, is such laches
   as to defeat their claim.  p. 472.

6. Whatever title to land in what is now Wisconsin Point, Doug-
   las county, was possessed by Chippewa Indians was ceded by
   them under treaty to the United States, with the right of oc-
   cupancy retained until terminated by government order; and

such right of occupancy, as concerns lawful occupancy of those claiming by patent from the United States to the land in 1854, was terminated by an executive order in 1850.  p. 474.

7. Where the validity and good faith of a homestead entry was in contest before the Interior Department, and plaintiffs' ancestor was a party thereto, making claim himself but not asserting any trust relationship on the part of the original entrant, the decision of the department that the original entry was valid is conclusive as against the claim of plaintiffs that it was in trust for their ancestor.  p. 474.

8. The right to adverse possession of burial ground being a tribal right, if any, the evidence is *held* not to show any change in the situation such as would change the tribal claim from the time of the death of the tribal chief to an individual claim of plaintiffs' ancestor as a member of the tribe.  p. 475.

APPEAL from and motion to review a judgment of the circuit court for Douglas county: W. R. FOLEY, Circuit Judge. *Affirmed on plaintiffs' appeal; modified on defendants' review.*

Action commenced January, 1919, to assert title to and recover possession of Wisconsin Point in the city of *Superior,* said county.

The plaintiffs *John B.* and *Peter Lemieux* and *Maggie Martineau* were the children, and the plaintiff *Philip Lemieux* a grandson, of one Frank Lemieux.

Frank Lemieux's father was a Swiss, his mother an Indian of the full or half blood.  He was enrolled as a member of the Fond du Lac band of Chippewa Indians. He died in 1902, his widow in 1906.

In about 1848 or 1849 Frank Lemieux married the daughter of Chief Osagie, then and until his death in 1875 the head of said Fond du Lac band.  For many years prior to his death he lived with Frank Lemieux.  Osagie was succeeded as chief by his son.

Wisconsin Point, a mile and a half or more long, was, as plaintiffs claim, originally an island, but for many years at least has been a peninsula projecting northeasterly from the main land into Lake Superior, with Allouez Bay on the

inner side and facing Minnesota Point.˙ It was subsequently included in government lots 1 and 2 in section 32, government lot 1 in section 27, government lots 2 and 1 in section 28 (extending in that respective order from the main land northeasterly), by government survey made in August, 1853, filed in September, 1853.

The first house was built by Frank Lemieux on government lot 2, section 28, in 1849, or shortly prior thereto. He and his family occupied this until apparently some time between 1854 and 1857, when he built a second house on lot 1, section 28, more than half a mile westerly from the first house. In 1861 or 1862 he built a third house and in 1885 a fourth house, each also on said lot 1 and within a few hundred feet from the second house.

This Point, very narrow, almost entirely of sand, and with sparse vegetation and few trees, was occupied for many years from 1849 on by said Fond du Lac band of Indians and during the summer months by occasional visitors or campers.

A small tract not to exceed 100 by 150 feet in size had been used from a time prior to 1849 for burial purposes by the Indians and occasionally by others, with the permission of Frank Lemieux or some member of his family, who had assumed control of the same. In about 1890, by the joint efforts of those then occupying the Point, both Indians and whites, a fence was built to surround such cemetery. In 1918, by agreement of all those apparently then interested, the bodies in said cemetery were removed to another on the main land.

The plaintiffs assert rights to this entire strip known as Wisconsin Point through claim of title of their ancestor, Frank Lemieux.

The defendant city of *Superior* asserts title to the streets or highways laid out upon said Point and to space that was, in the original platting, dedicated as a park, called Inde-

pendence Square.　The defendant *Agate Land Company*
asserts title to the remainder of Wisconsin Point by pur-
chase through mesne conveyances of the original title from
the government, which both defendants assert was created
under two certain entries under the Pre-emption Act of 1841
and as follows:

1. For the portion of the Point nearer the main land by
one Joseph DuBay March 15, 1854, of lots 1 and 2, sec-
tion 34, containing 142.57 acres, for which payment was
made by said DuBay pursuant to receipt of and certificate
of the land office of the same day.　This was followed by a
patent under the hand of President Pierce July 22, 1854.

2. For the extremity of the Point, an application by
Joseph A. Bullen on February 9, 1854, for lots 1 and 2 of
section 28, and lot 1 of section 27, containing 104.77 acres.
A receipt and certificate were of the same date.

Before any patent, however, was issued under this Bullen
entry, an executive order was made March 13, 1854, reserv-
ing the said sections 27 and 28 for military purposes, and
the matter remained in abeyance for a long time.　Bullen on
February 18, 1854, gave a deed for this property under
which defendants now claim.　One Bardon, the first white
to build on the island in 1884, applied for homestead entry;
this, after hearing, was rejected because of prior entry of
Bullen.　Bardon and one Gage contested the validity of the
Bullen entry.　Under act of Congress of February, 1887,
permitting persons of Indian blood to make claim for allot-
ment, said Lemieux asserted a claim for lots 1 and 2 of the
Bullen entry, relying also upon his former occupancy.

After many proceedings before the Land Department and
after the order reserving said sections for military purposes
had been modified and held not effective, decisions of the
Interior Department were made in 1891 and 1893 recogniz-
ing the rights that had grown up by over 400 purchasers in
good faith under the Bullen deed of 1854; denying all

counter assertions of title; and directing the issue, under the confirming act of 1891, of the patent to Bullen. A patent by President Harrison was issued and dated November 23, 1891.

Reliance is placed by the plaintiffs upon the effect and provisions of certain treaties with the Indians:

First, a treaty of August 3, 1795, by which the right of possession or occupancy to territory including that here involved was ceded to certain Indian tribes. *Jones v. Meehan,* 175 U. S. 1, 8, 9, 20 Sup. Ct. 1.

Second, the treaty of 1842, established by executive proclamation March 23, 1843, by which certain territory, including this, was in turn ceded back by the Chippewa Indians, there being reserved to them the right of occupancy until order of removal by the President.

Third, a treaty of September 30, 1854, proclaimed as such January 29, 1855, containing the following provisions:

Paragraph 7, article 2. "Each head of a family, or single person over twenty-one years of age at the present time of the mixed bloods, belonging to the Chippewas of Lake Superior, shall be entitled to eighty acres of land, to be selected by them under the direction of the President, and which shall be secured to them by patent in the usual form."

Article 10, headed "Pre-emption Right." "All missionaries, and teachers, and other persons of full age, residing in the territory hereby ceded, or upon any of the reservations hereby made by authority of law, shall be allowed to enter the land occupied by them at the minimum price whenever the surveys shall be completed, to the amount of one quarter-section each."

This treaty reserved certain lands for the respective bands and made provisions for payments.

The court below, after a long trial with many witnesses and much testimony as to the nature of the occupancy of Wisconsin Point in early days, made findings as to the relationship of the plaintiffs to said Frank Lemieux; his

building the houses and occupancy; the· Bullen and DuBay entries; the contest as to the former; the platting by the purchasers from Bullen and DuBay; the subsequent purchases and possession in good faith in reliance thereon; and many other facts.

He also found that there was no proof of any privity between said Bullen and Frank Lemieux or other facts which would support a claim that the title of Bullen was in trust for Lemieux, and that in the event of such facts the long period of time that has elapsed would bar any such claim on account of laches.

Also that there is no proof showing a substantial inclosure of any portion of Wisconsin Point being maintained for any substantial time by Frank Lemieux or the plaintiffs except fences around certain of the buildings and the cemetery; that the dwelling houses on lot 1 from 1855 and thereafter, and some small buildings and small gardens, were inclosed by fence and kept by Frank Lemieux and some of the plaintiffs· continuously for more than twenty years from the issuance of the patent in 1891. That such property so occupied, however, was within the portion of the public plat dedicated as a public park and known as Independence Square and upon an .adjoining public street. That the cemetery was looked after and controlled by Frank Lemieux from at least 1854 down to his death in 1902 and thereafter by one or more of his children; that there were buried thereon Chief Osagie and his wife, Frank Lemieux and his wife, several of their children and grandchildren, and others both of Indian and white blood not related to Frank Lemieux; some of the graves being marked by wooden crosses and inclosed by fences and the entire cemetery being so inclosed prior to 1891.

That before the commencement of this action the defendant *Agate Land Company* had purchased in good faith and for approximately $300,000 all of the fee and tax titles to

this land except the parts dedicated for streets and parks, and had also purchased the possible rights of one Mary Lavierge and Joseph, her husband, the former being one of the remaining living children of said Frank Lemieux.

As conclusions of law: that the plaintiffs were the owners of a four-fifths interest in and to the cemetery (the other one-fifth interest having been acquired by purchase by defendant from the said Mary Lavierge); that the defendants, *Agate Land Company* and the city of *Superior,* are entitled to their respective rights declared to exist in the remainder of the property, other than the cemetery, and barring the plaintiffs from any right or title except as to the cemetery aforesaid; and judgment was so directed. No costs to either party, except the plaintiffs to pay the clerk's fees.

From such judgment plaintiffs appeal, and defendants seek to review so much thereof as awards plaintiffs a four-fifths interest in the cemetery.

For the appellants there were briefs by *Dietrich & Dietrich* of Superior and *Ernest A. Arnold* of Duluth, attorneys, and *Arnold & Arnold* of Duluth, of counsel, and oral argument by *John B. Arnold.*

For the respondent *Agate Land Company* there was a brief by *Hanitch, Hartley & Johnson* of Superior, attorneys, and *Frank D. Adams* and *Elmer F. Blu,* both of Duluth, and *Henry S. Butler* and *John C. Fritschler,* both of Superior, of counsel, and oral argument by *Clarence J. Hartley* and *Oscar J. Johnson.*

*L. R. M'Pherson* of Superior, for the respondent *City of Superior.*

ESCHWEILER, J. Upon the issue presented by appellants' appeal, namely, plaintiffs' assertion of title to all or a part of what is known as Wisconsin Point in the city of *Superior* and the counter assertions of title by defendants, the record presents a great deal of testimony from a vast number of

witnesses and evident care and discrimination by the trial court in arriving at its determination.

If the DuBay homestead entry in March of lots 1 and 2, section 34, of 142.57 acres with the patent following on July 22, 1854, and the Bullen homestead entry in February, 1854, of lots 1 and 2, section 28, and lot 1, section 27, of 104.77 acres, final patent, however, not being issued until November, 1891, were valid and regular and good title thereby conveyed, that virtually and adversely disposes of the main contentions by plaintiffs.

Nothing of a serious nature is or can be urged against the title to the property covered by the DuBay entry. All proceedings connected with this entry and the patent issued thereon in 1854 are regular and sufficient on their face. Many purchasers occupied in good faith and in belief of the validity of such patent. The defendant *Agate Land Company* became a good-faith purchaser from such, and at no time prior to 1918 does there appear to have been any substantial assertion of adverse claim to such property by or through Frank Lemieux, the only source through whom plaintiffs now assert title.

Under the Bullen entry the situation was somewhat different. As to this, plaintiffs assert its invalidity, but that if held valid as a good-faith entry as against the government, then it was in trust for Frank Lemieux.

The granting of a patent on Bullen's application of February, 1854, for 104.77 acres was long delayed:

First, by an executive order in March, 1854, declaring an intention of reserving a substantial part of such land for military purposes, it being right at the then entrance to the large, important, and landlocked harbors of the now large cities of Superior, Wisconsin, and Duluth, Minnesota. This asserted reservation was, as to part of the land, withdrawn, and as to the rest held invalid as against the Bullen entry.

Second, because of other applications for the same land

or portions thereof; one by Frank Lemieux himself in 1891 seeking to have eighty acres assigned to him under his rights as an Indian of the half blood under the treaties and an act of February 8, 1887; in such application, however, he made no claim such as is now presented to the effect that Bullen's entry was in trust for him, Lemieux, but did allege occupancy since 1849. After much delay and many hearings and under a federal statute of May 8, 1891, confirming the granting of patents where lands had been purchased and occupied in good-faith reliance upon entries, thereafter contested, it was determined by the Department of the Interior that said entry of Bullen should be recognized as valid and a patent issue, which thereupon did issue in November, 1891.

Such a decision of the Interior Department, acting as an arm of the Executive, being in a matter over which it had proper jurisdiction and power, after full opportunity to be heard had been accorded all who might or did assert title in their own right or who contested the validity of the Bullen entry, followed as it was by the patent by the Executive, ended, and for all time, any or all questions as to the original homestead entry, the basis of and essential to the validity of the chain of title following such entry. Such controlling effect, in the absence of fraud, is given to decisions of the Interior Department on questions of title of lands from the government up to and including the issuing of the patent by virtue of federal statute and decisions. *Cameron v. U. S.* 252 U. S. 450, 460, 40 Sup. Ct. 410; *Ross v. Day,* 232 U. S. 110, 116, 34 Sup. Ct. 233; *Love v. Flahive,* 205 U. S. 195, 198, 199, 27 Sup. Ct. 486; *Hawley v. Diller,* 178 U. S. 476, 490, 20 Sup. Ct. 986; *Oregon Basin O. & G. Co. v. Work,* 6 Fed. (2d) 676; *Edenborn v. U. S.* 5 Fed. (2d) 814; *McCord v. Hill,* 117 Wis. 306, 309, 94 N. W. 65, affirmed 195 U. S. 395, 25 Sup. Ct. 792. See, also, *U. S. v. Minnesota,* 270 U. S. 181, 206, 46 Sup. Ct. 298. The same effect is given to rulings on questions of fact by other executive

departments.    Postmaster General: *Leach v. Carlile,* 258
U. S. 138, 140, 42 Sup. Ct. 227; Secretary of Agriculture:
*Houston v. St. Louis I. P. Co.* 249 U. S. 479, 480, 39 Sup.
Ct. 332, and cases there cited; a special tribunal such as the
court of claims: *U. S. v. Minnesota,* 270 U. S. 181, 199,
46 Sup. Ct. 298.

Plaintiffs contend that we should hold the Bullen and
DuBay entries of 1854 invalid because premature, in that,
though made after the government survey of August, 1853,
yet both were made before the map was, as they claim, regu-
larly filed in the proper land office, and that therefore until
the time of such filing there was in existence no lawful sup-
port for such applications; and in that such entries were made
before the exclusive treaty rights of the Indians were ex-
tinguished.

We see no force in such positions.    The record shows a
filing of the survey in September, 1853, and not in 1856.
Clearly no one other than the United States could now prop-
erly be heard to assert any such contention, even if it had
any weight.    Surely it cannot now be entertained as against
good-faith purchasers.    The delay of more than fifty years
in its assertion would be sufficient to destroy its effectiveness.
The ultimate fee being in the United States (*Jones v. Mee-
han,* 175 U. S. 1, 8, 20 Sup. Ct. 1), the executive order of
removal in 1850 terminated the exclusive right to occupancy,
and the United States could give good title.

Plaintiffs strenuously insist that there was such adverse
possession of all or part of Wisconsin Point by Frank Lem-
ieux and themselves that thereby they have good title.    The
great amount of testimony offered on this proposition and
evidently heard and considered patiently by the trial court
need not be reviewed.    There was nothing which needs
present consideration tending to show any inclosing by fence
or other recognized form for asserting title or right as to
Wisconsin Point as a whole.    The fences erected from time

to time at various points on the island did not mark off any definite portions thereof as being held under claim of ownership by Frank Lemieux, save so much as inclosed, for varying periods of time, the respective houses he built and occupied after the abandonment of the first house or the gardens in connection with such houses. And as to all of these inclosures they were within that portion of the early plat which was dedicated as a public park and accepted as such by the city except a small strip which extended into a public street adjoining such park. The concesson is advisedly and frankly made that as against the defendant city, accepting property for a public purpose under such a plat and in the situation here disclosed, the plaintiffs could have acquired no title by adverse possession, either their own or that of their ancestor.

Neither could there be adverse possession prior to the issuing of the patents, for such would be the asserting of a claim of right against the sovereign. *Redfield v. Parks,* 132 U. S. 239, 244, 10 Sup. Ct. 83; *Northern Pac. R. Co. v. Slaght,* 205 U. S. 122, 123, 27 Sup. Ct. 442; *Hays v. U. S.* 175 U. S. 248, 260, 20 Sup. Ct. 80; *Gibson v. Chouteau,* 13 Wall. (80 U. S.) 92, 99; *Whitney v. Gunderson,* 31 Wis. 359, 376.

Furthermore, the delay in asserting in any proper manner, at any time prior to the commencement of this action in 1919, of any such claim in face of the known occupancy of all this land by others in reliance upon the record title, is of itself such laches as to defeat the present assertion by plaintiffs. *Moran v. Horsky,* 178 U. S. 205, 208, 20 Sup. Ct. 856. So held as to one claiming title under Indian treaty and of Indian blood in *Felix v. Patrick,* 145 U. S. 317, 332, 12 Sup. Ct. 862, and the same in *Lemieux v. U. S.* 15 Fed. (2d) 518. There is here no such situation of reliance by defendant upon a deed directly void because in violation of some express statute, as to which the doctrine of laches does

not apply as held in *Ewert v. Bluejacket,* 259 U. S. 129, 138, 42 Sup. Ct. 442.

Plaintiffs also claim that although by the treaty of 1842 the Indians ceded the title of all this territory to the United States, nevertheless their right of occupancy being in such treaty expressly recognized as continuing until their removal was accomplished by executive order, such right of occupancy was never terminated; and therefore the continuous living by Frank Lemieux on the land, and the continued living there by some of his children after his death until the commencement of this action, was such an occupancy under the treaty as would prevent there being any lawful disposal by the United States of this property or any possible good title in any one other than the plaintiffs. Reliance is placed upon recitals that there was no such executive order of removal found in two cases: *U. S. v. Thomas,* 151 U. S. 577, 14 Sup. Ct. 426 (in 1894), presenting the question of federal jurisdiction to try an Indian charged with murdering another Indian on one of the reservations in this state; it recited (p. 582) that the Indians have never been removed from lands thus ceded, and no executive order has ever been made for their removal and no change in their occupancy except by the treaty of 1854; and it was held (p. 584) that, in the absence of any proof that the Chippewa Indians have surrendered their right of occupancy, the right still remains with them as against any right of occupancy by the state of Wisconsin, and that occupancy by the Indians, so far as the court was informed, had never been released to such lands. Again, in *U. S. v. J. S. Stearns L. Co.* 245 U. S. 436, 38 Sup. Ct. 137 (in 1918), an action brought to cancel patents issued by this state to the Stearns Lumber Company for certain lands in the La Pointe Indian reservation, again referring to the treaty of 1842 and the privileges of occupancy until removed by the President, it recited (p. 437): "The President did not remove the Indians." Upon these two cases it

is argued that the federal courts have taken, and this court must take, judicial notice that there was no termination of the right of occupancy by any executive order. In the present case, however, there was offered and received in evidence that which was certified to be a copy of an executive order of removal purporting to be signed by President Taylor February 6, 1850.

We find no grounds upon which the validity of such a document or its competency as evidence can properly here be .questioned. That it evidently was not presented and offered in evidence in the two cases just above quoted cannot detract from its validity when now offered and properly received. What was said by way of recital in those two cases, *supra,* must of course extend no further than the facts presented in each. We must therefore hold that any form of title to this land then possessed by them (see *Jones v. Meehan,* 175 U. S. 1, 8, 20 Sup. Ct. 1, *supra*) was ceded by the Indians under the treaty of 1842–1843, and their right of occupancy, so far as it would interfere with the lawful occupancy of those claiming by patent from the United States is concerned, was terminated upon said executive order of 1850.

The claim that the Bullen entry was in trust for Frank Lemieux was properly denied by the court below. Such claim rested upon the testimony of the plaintiff *Maggie Martineau* that she, then a child of about five years, knew that in the winter of 1853–1854 Bullen lived with her father and that no whites built or lived on the Point prior to 1883 or 1884, the time of Bardon's occupancy. The validity and good faith of this Bullen entry was in contest before the Interior Department for many years, Lemieux himself being a party to the proceeding, making claim himself, but in no manner asserting any such claim of trust relationship, as would have been eminently proper for him to then and there assert if true. One of the specific objections to Bullen's

entry, as shown from the recitals in the records of the Interior Department, was that he had made such homestead entry for the company by which he was then employed and *not in good faith for himself.* The decision of the department that the Bullen entry must be held valid must be deemed conclusive against plaintiffs on all these points. The long delay in asserting such a claim is also an effectual bar.

Other questions presented by appellants on their appeal we do not deem to need specific mention or discussion.

The trial court gave plaintiffs title to a four-fifths interest in the small parcel of land that had been used for burial purposes. Defendant *Agate Land Company* contends that such determination ought not to stand. We must uphold them on this point. Any claim by adverse possession upon which the court could rest title in the plaintiffs to this piece of land would have to be by reason of the assertion of an exclusive ownership for twenty years and more in Frank Lemieux as an individual and in his own right as such an individual. There was here, however, the assertion for the Fond du Lac band of Indians of a tribal right as distinguished from the assertion of an exclusive right of an individual member of that band. It was clearly such a tribal right during the lifetime of Chief Osagie, Frank Lemieux's father-in-law, the recognized head of the band, and who made his home with said Lemieux during many of the later years. There is nothing to show any change in the situation as to the claim of ownership or as to exclusive possession after the death of Chief Osagie such as would change the tribal claim from then on to an individual claim of Frank Lemieux or by his heirs tracing through and dependent upon some right in Lemieux. The assertion of plaintiffs, therefore, to individual ownership cannot be maintained. What rights, if any, to this plot of ground, no longer dedicated to or used for burial purposes since the removal of the bodies therefrom by consent in 1918, may be remaining in the Fond du

Lac band of Chippewa Indians, is not before us, and we express no opinion on the point.

*By the Court.*—Judgment affirmed on plaintiffs' appeal; reversed on defendants' review. Appellants to pay clerk's fees on this appeal. No other costs allowed.