BOARD OF COMMISSIONERS OF PUBLIC LANDS
You have been contacted by an attorney who is in the process of examining title to and rendering an opinion on lands which he has described in his letter as follows:
 "Part of the Southeast Quarter (SE 1/4) of the Southwest Quarter (SW 1/4) of Section Seventeen (17), Township Thirty-one (31) North, of Range Eight (8) West, situated in the Town of Bloomer, Chippewa County, Wisconsin." *Page 208 
The letter further states:
 "The entire section of land was conveyed to the State of Wisconsin under the swamp lands act of September 28, 1850. The patent from the State of Wisconsin to John McGee was dated February 13, 1914 and made specific reference to the Act of Congress of 1850 and then recited that the conveyance `is subject to reservations as provided by paragraph 6, Section 1, Chapter 452 Wisconsin Laws of 1911.'
 "At some time prior to the date of said patent from the State of Wisconsin, there was created an artificial lake that now covers submerged lands in the 40 acre tract above described.
 "One of the problems here is that my clients and several others owning property along the edge of Marshmiller Lake have been unaware of the legal consequences of the `reservation' and have paid no attention to it in the past. Now that they have found out that this constitutes a chain of land or 66 feet, in fee, from the border of the lake, they are obviously quite concerned. I presume that all previous conveyances in all cases have simply excepted routinely, reservations, restrictions and easements of record, and no one has bothered to look up the cited portion of Chapter 452 of Wisconsin Laws of 1911.'
 "I would like to point out that according to my investigation, at the time of the original government survey, O'Neil Creek and none of its tributaries were in the 40 acre tract above described. However, once damned [sic], the lake did and now protrudes into that 40 acres."
Paragraph 6, under sec. 1 of ch. 452, Laws of 1911, reads, in part:
 "Every contract, certificate of sale, or grant hereunder of public lands shall be subject to the continued ownership by the state; of the fee to all lands bordering on any meandered or non-meandered stream, river, pond or lake, navigable in fact for any purpose whatsoever, to the extent of one chain on every side thereof, and shall reserve to the people the right of access to such lands and all rights necessary to the full enjoyment of such waters . . . ." *Page 209 
 Legislative History
The provision appeared in sec. 209, subsec. 6, Stats. (1911). The language remained unchanged until the enactment of ch. 279, Laws of 1951, which amended the provision by striking the language, "shall be subject to the continued ownership by the state, of the fee to all lands bordering on any meandered or non-meandered stream, river, pond or lake, navigable in fact for any purpose whatsoever, to the extent of one chain on every side thereof . . . ."
The provision under consideration last appeared in sec. 24.11
(3), R.S. 1949, but, of course, was law until the effective date of ch. 279, Laws of 1951, which was June 8, 1951. Accordingly, the provisions of sec. 1 of ch. 452, Laws of 1911, were in force from June 29, 1911, the effective date of ch. 452, Laws of 1911, to the effective date of the amendment or June 8, 1951, a period of approximately forty years.
You were previously advised that "attempts to repeal chapter 452, Laws of 1911, failed for many years." A review of the legislative history does not show this to be the fact. The relevant legislative history of the law in question up to the 1951 session of the legislature is as follows:
Created by ch. 452, Laws of 1911.
Appeared in 1911 Statutes, as sec. 209, subsec. 6.
 Chapter 597, Laws of 1913, renumbered subsec. 6 to subsec. 3.
 Chapter 454, Laws of 1917 made extensive revisions to ch. 15 of the 1915 Statutes, but only resulted in a renumbering of sec. 209, subsec. 3 to sec. 24.11 (3).
Between 1917 and the passage of ch. 279 in 1951, there was no legislative action involving the provision, except sec. 4978, Stats. (1917). This section repealed ch. 452, Laws of 1911, and ch. 597, Laws of 1913. It is probably this statute that gave rise to the claim that attempts had been made to repeal the law. The repeal of the prior session laws had no legal significance, for the law prior *Page 210 
to the repeal of the session laws had been recreated by ch. 454, Laws of 1917.[1]
 Adverse Possession
First, consideration must be given to the question of whether the state lost title to those lands which were sought to be retained under and by virtue of ch. 452, Laws of 1911, through adverse possession. Generally, in the absence of statutory permission, adverse possession will not run against the state. 3 Am. Jur. 2d, Adverse Possession, sec. 205. Wisconsin is in accord with the general rule that a claim based on adverse possession cannot be asserted against the sovereign. Lemieux v. Agate LandCo. (1927), 193 Wis. 462, 214 N.W. 454. However, legislative permission was granted by the enactment of ch. 79, Laws of 1931 (effective May 3, 1931). The 1931 amendment to sec. 330.10, Stats. (1929), provided:
 ". . . But no person can obtain a title to real property belonging to the state by adverse possession, prescription or user unless such adverse possession, prescription or user shall have been continued uninterruptedly for more than forty years."
Approximately twenty-six years after granting the above permission, the legislature enacted ch. 192, Laws of 1957 (effective June 19, 1957). The amendment of 1957 added the following language to sec. 330.10, Stats. (1955):
 ". . . No title to real property held in trust by the state under s. 24.01 (2) to (6) shall be obtained by adverse possession, prescription or user."
The language of the statute has remained unchanged since the 1957 amendment, but has been renumbered to sec. 893.10 (1), Stats. (1973).
Thus, prior to the Act of 1931, no claim of title based on adverse possession could be asserted against the state. For *Page 211 
approximately twenty-six years, 1931 to 1957, the legislature had given its consent to such claims as to any and all public lands. Since the Act of 1957, the legislature has revoked its permission as to those lands described in sec. 24.01 (2) to (6). The lands described in sec. 24.01 (2) to (6), are generally referred to as trust lands. At the present time, it is sufficient to state that the subject lands of this opinion fall within the classification of trust lands. Accordingly, as to the subject lands, the Act of 1957 precludes adverse possession.
The period of legislative consent as to public trust lands only extended between 1931 and 1957, a period of twenty-six years. It can, therefore, be contended that title to such lands could not be perfected through adverse possession, for such claim must be based on forty years of adverse possession.
The question of adverse possession, as stated previously, only involves the fee interest in the sixty-six foot shoreland strip. Despite the fact that legislative consent to adverse possession of trust lands only lasted for a period of twenty-six years, an argument in support of private claims to title based on this doctrine can be made.[2]
Such argument would necessarily be based on occupation that commenced after the enactment of ch. 452, Laws of 1911. Further, the occupation would have had to commence prior to June 19, 1917, in order for the forty years of adverse possession to have run prior to the revocation of consent by the Act of 1957. Thus, such claims are restricted to those that existed uninterruptedly commencing during the six-year period between 1911 and 1917, insofar as the subject matter of this opinion is concerned.
The argument is premised on the theory that the several statutes of limitations, which establish the doctrine of adverse possession, look to the accomplishment of past fact, i.e. occupation, as a bar to the claims of another. Thus, when sec. 330.10, Stats. (1929) was amended in 1931, allowing adverse possession against the state, there was nothing in the language of the amendment to suggest that occupation prior to such consent would not give rise to *Page 212 
bar the claim of the state. In other words, the argument would have to take the position that the statute estopped the state from claiming title as to anyone who adversely possessed state lands for the requisite period, regardless of whether a portion of such period of occupation occurred prior to the enactment of ch. 79, Laws of 1931.
If this argument is correct, there may be those who can claim title to trust lands. The subsequent revocation of consent as to adverse possession of trust lands (ch. 192, Laws of 1957), would not have divested such persons of vested rights. Christenson v.Wikan (1948), 254 Wis. 141, 35 N.W.2d 329.
In discussing this issue, but in a somewhat different manner, it is noted in 2 C.J.S., Adverse Possession, sec. 6:
 "Prospective or retrospective operation. Adverse possession statutes have a prospective application only, and will not be given a retrospective operation. They apply where possession is taken after they have gone into effect, and a compliance with their provisions is necessary to obtain the benefit thereof. However, it has been held that the law as it exists at the time of the perfection of the adverse possession and the passage of title controls, rather than the law as it existed at the beginning of the adverse possession, and the effect of adverse possession is subject to change by statute at any time."[3]
The argument that possession prior to the existence of the right of adverse possession may be considered in achieving the subsequently prescribed period, in my opinion, fails to recognize the status of the sovereign and the nature of adverse possession.
In Polanski v. Town of Eagle Point (1966), 30 Wis.2d 507,141 N.W.2d 281, it was noted that the underlying idea of adverse possession is not to reward the one in possession, but rather to impose a penalty upon the negligent owner. Such theory of adverse possession is inconsistent with retroactive application of the statute against the sovereign. It is incompatible with the concept of the school fund. The state could hardly be considered negligent when the law prior to legislative consent precluded adverse possession. The theory of adverse possession is only consistent with prospective application. *Page 213 
In Shellow v. Hagen (1960), 9 Wis.2d 506, 511, 512,101 N.W.2d 964, the court, in considering the elements necessary to establish an easement by prescription (adverse possession), stated:
 ". . . An act is hostile when it is inconsistent with the right of the owner and not done in subordination thereto . . . .
"* * *
 "The concept of adverse use includes a use which is wrongful or may be made wrongful by the owner, is open and notorious, and not made in subordination to the right of the owner . . . ."
Any use of state trust lands by private citizens was by operation of law subordinate to the rights of the public, for in the absence of legislative consent, such use could never be considered superior to the rights of the public at large.
It is my opinion that the case law and underlying theory of adverse possession do not support the argument favoring retrospective operation of ch. 79, Laws of 1931.
Lands Involved
The property involved was originally acquired by the state by that Act of Congress which is generally referred to as "an Act of Congress to enable the State of Arkansas and other states, to reclaim the swamp lands within their limits," approved September 28, 1850.
The Act of 1850 is also referred to as the Swamp Lands Act of 1850.
The lands conveyed to the state by the Swamp Lands Act of 1850 and other lands were partitioned by ch. 537, Laws of 1865, so that one-half of such lands or the proceeds from such lands would be used for school purposes and one-half was to be used for drainage or reclamation. This division has no significant bearing on this opinion as will be subsequently shown.
School Lands
As noted above, fifty percent of the lands received by the state, pursuant to the Act of September 28, 1850, constituted what is *Page 214 
generally referred to as school lands.[4] Such lands are subject to the protection and mandate of Art. X, sec. 2, Wis. Const., which reads, in part:
 "The proceeds of all lands that have been or hereafter may be granted by the United States to this state for educational purposes (except the lands heretofore granted for the purposes of a university) . . . shall be set apart as a separate fund to be called `the school fund,' the interest of which and all other revenues derived from the school lands shall be exclusively applied to the following objects, to wit:
 "1. To the support and maintenance of common schools, in each school district, and the purchase of suitable libraries and apparatus therefor.
 "2. The residue shall be appropriated to the support and maintenance of academics and normal schools, and suitable libraries and apparatus therefor."
Additionally, Art. X, secs. 7 and 8, Wis. Const., provide, in part:
 "SECTION 7. The secretary of state, treasurer and attorney-general, shall constitute a board of commissioners for the sale of the school and university lands and for the investment of the funds arising therefrom . . . .
 "SECTION 8. Provision shall be made by law for the sale of all school and university lands after they shall have been appraised . . . The commissioners shall have power to withhold from sale any portion of such lands when they shall deem it expedient, and shall invest all moneys arising from the sale of such lands, as well as all other university and school funds, in such manner as the legislature shall provide . . . ."
In The State ex rel. Sweet and others v. Cunningham and others
(1894), 88 Wis. 81, 82, 83, 57 N.W. 1119, the court *Page 215 
considered school lands under the provisions of Art. X, and concluded:
 ". . . These lands mostly belong to the school fund of the state. The school fund is a trust fund, and is placed by the constitution beyond the power of the legislature to divert it to any other use than the support of the schools of the state. It could not set them, or any part of them, apart for a state park. Const. Wis. art. X, sec. 2; Lynch v. The Economy, 27 Wis. 69; People v. Allen, 42 N.Y. 404. Neither could it withhold these lands from sale. That power is confided to the discretion of the commissioners of public lands by the constitution, and lies in no other office or body. Const. Wis. art. X, sec. 8; State ex rel. Crawford v. Hastings, 10 Wis. 525; McCabe v. Massuchelli, 13 Wis. 478; State ex rel. Kennedy v. Brunst, 26 Wis. 412 . . . ."
In discussing the division of swamp lands under the provisions of ch. 537, Laws of 1865, the court in State ex rel. Owen v.Donald (1915), 160 Wis. 21, 114, 151 N.W. 977, stated:
 "The deliberately made partition of lands derived by the state under the swamp land act, which was made under the state law of 1865 and confirmed by the act of 1869, illustrated by acquiescence therein for more than thirty years by all who had to do therewith, is a binding exercise of the state's option to take such part of the lands in question for drainage as it deemed necessary. The school fund share thereby passed wholly within the constitutional jurisdiction over lands held in trust for educational purposes, possessed by the commissioners of public lands under the ruling in State ex rel. Sweet v. Cunningham, 88 Wis. 81, 57 N.W. 1119, 59 N.W. 503, or by the legislature, according as we must decide there is a difference between the two classes of lands."[5]
The above authority makes it quite clear that the legislature cannot use school lands for other purposes. In the Cunningham
case, supra, the court struck down an attempt by the legislature to use such lands for park purposes, and in the Owen case, supra, the attempted use of school lands for forest reserves was similarly voided. *Page 216 
Under Art. X, sec. 8, Wis. Const., the discretion to withhold such lands from public sale is vested in the commissioners and they are not in this matter subject to legislative direction.
Other Lands
There is no constitutional provision which precludes the legislature from directing the retention of non-school lands or from prescribing a particular use for such lands. However, I mention without discussion that such lands may be subject to a particular use by the terms of the federal grant or act.
Ch. 452, Laws of 1911
As to retention of fee interests, ch. 452, Laws of 1911, which created sec. 209, subsec. 6, Stats. (1911), only involved conveyances or transactions of public lands which abutted navigable waters. A navigable body of water is any body of water capable of floating logs. Olson v. Merrill (1877),42 Wis. 203,[6] The statute in question excepted from all conveyances or transactions the fee interest to a strip of land sixty-six feet in width abutting such waters. Additionally, it appears that a right of access to such lands was reserved as well as all mineral, mining rights and water-power rights.
The purpose of the Act was to prohibit the sale of any public lands, including school lands, which were situated within sixty-six feet of a navigable body of water and to permanently set aside such lands for public parkway use.
Shortly after the passage of the Act in question, the Public Lands Commissioners were advised by the Attorney General that the statute was unconstitutional insofar as it attempted to use school trust lands for park purposes.
This opinion [1 OAG 89, 92 (1911)] stated:
 "The provision reserving to the public lands bordering on any meandered or nonmeandered stream, river, pond or lake navigable, in fact, for any purpose whatever to the extent of *Page 217 
one chain on either side thereof, cannot be carried out so far as these school lands are concerned for the reason that the Legislature has no power to set apart or appropriate the school lands or any portion thereof for state park or for any other purpose other than that contemplated by the constitution; neither can the legislature withhold such lands from sale. See State v. Cunningham, 88 Wis. 81."
The views expressed in 1 OAG 89 are as valid today as they were when written. The legislature apparently recognized its invalidity when it amended the section in 1951.[7]
Regardless of the public benefit and enjoyment sought to be obtained or more accurately retained by the provisions of sec. 209, subsec. 6, Stats. (1911), I can only conclude that the law in question, insofar as it attempted to use school lands for the creation of public parkways, was repugnant to the Constitution and, therefore, void ab initio. State ex rel. Martin v. Zimmerman
(1939), 233 Wis. 16, 288 N.W. 454. However, the statute was not unconstitutional as applied to those public lands which were not subject to the mandate of Art. X, Wis. Const.
Specific Land In Question
The specific parcel in question was acquired under the Swamp Lands Act of September 28, 1850. Therefore, as indicated previously, under the Act of 1865, the question could be raised as to whether such lands belong to the drainage fund or the school fund.[8] *Page 218 
The minutes of the Board of Commissioners of Public Lands for October 5, 1911, show, upon receipt of the Attorney General's opinion (1 OAG 89), the following action:
 "Opinion by Attorney General to effect that Chapt 452, Laws of 1911, is unconstitutional, so far as it applies to School lands, was considered and it was Moved by Mr. Dahl: That sales of State School lands be made only in conformity with opinion of Attorney General dated Sept 1911, as to constitutionality of Chapt 452, Laws of 1911, and, that sales of other state lands be made in conformity with said law until further interpretation thereof by the Attorney General."
This acquiescence in the opinion of the Attorney General shows that the commissioners apparently did not intend to reserve from any conveyance or transaction involving school lands a sixty-six foot strip along navigable waters. However, the certificate involving the parcel now under consideration, which was issued on May 28, 1912, provides:
 ". . . the said purchaser, his heirs, assigns or other legal representatives be entitled to a Patent for the land herein described, subject to the reservations provided for in Paragraph 6, Section 1, of said Chapter 452 of the Laws of Wisconsin for the year 1911, which reads as follows:
 "6. Every contract certificate of sale or grant hereunder of public lands shall be subject to the continued ownership by the state, of the fee to all lands bordering on any meandered or non-meandered stream, river, pond or lake, navigable in fact for any purpose whatsoever, to the extent of one chain on every side thereof, and shall reserve to the people the right of access to such lands and all rights necessary to the full enjoyment of such waters and of all minerals in said lands, and all mining rights therein, and shall also be subject to continued ownership by the state of all water power rights on such lands or in any manner appurtenant thereto. Such conveyance shall also be subject to a continuing easement in the state and its assigns to enter and occupy such lands in any manner necessary and convenient to the removal of such mineral from such lands and to the proper exercise of such mineral rights, and shall be further subject to the continuing easement in the state and its assigns to enter and occupy such *Page 219 
lands in any manner necessary and convenient to the development, maintenance and use of any such water rights. Nothing contained in this section shall be construed to provide for the continued ownership in the state of any stone used for building purposes nor of any sand or gravel."
The patent, which was issued on February 13, 1914, provides:
 "To Have and to Hold the Same, together with all the Rights, Privileges, Immunities and Appurtenances of whatsoever nature thereunto belonging unto the said John McGee and to his heirs and assigns forever, subject to reservations to State provided by paragraph 6, Section 1, Chapter 452, Wis. Laws of 1911."
There are, of course, two possible explanations for this apparent inconsistency, 1) the lands may not have been school lands, but may have, under the Act of 1865, been classified or treated as drainage lands, or 2) the commissioners may have simply had a change of mind. Whatever the explanation may be, the fact remains the sixty-six foot strip was not conveyed and this intent was clearly expressed in the instruments documenting the transaction.
Even if the lands were school lands and even if the commissioners were improperly motivated by what I have considered to be an unconstitutional act of the legislature, such assumed facts do not change the conclusion that the lands were not conveyed. The certificate quoted above evidences the intent of the commissioners not to convey the strip and such intent must have been understood by the purchaser.
Artificial Lake
The letter of inquiry raised three additional facts:
1. The body of water is an artificial lake.
 2. The lake was created prior to issuance of the patent.
 3. At the time of the original government survey, the subject lands did not border on any navigable body of water. *Page 220 
It does not seem significant that the body of water in question is an artificial lake.[9] The language in the statute, as well as in the certificate, is sufficiently broad so as to cover any navigable body of water.
It does not seem significant that at the time of the original government survey, there were no navigable waters within the subject lands. Nor does the situation that existed at the time of the patent control.
In my opinion, the circumstances that existed at the time of execution of the certificate, i.e., sale, would be controlling. In Mathy v. Mathy (1940), 234 Wis. 557, 562, 291 N.W. 761, our court noted that in the construction of a deed:
 ". . . the situation of the parties when the instrument was drawn may be considered and the instrument must be viewed in the light of the existing circumstances . . . ."
There is no language in the statute or certificate to support and it would be manifestly unfair to conclude that circumstances following the sale would govern. For example, if the subject lands did not involve a navigable body of water at the time of sale, the instrument and intent of the parties would have been to convey all lands. Then, assume that following the sale the purchaser's neighbor dammed a stream which created an artificial lake on purchaser's lands. Surely, such subsequent act of the stranger to the sale could not result in a forfeiture to the state of lands that were intended to be conveyed and were, in fact, conveyed. Nor, would the subsequent acts of the purchaser enlarge the state's interest. For example, assume the subject lands were crossed by a stream which the purchaser dammed after the sale and created a lake. Surely, the state's interest would be measured from the bank of the original stream which was, of course, the existing situation at the time of the sale. The state's interest would not be enlarged by the creation of the lake which may have occurred many years after the sale. Under this latter hypothetical situation, the state would own those presumably submerged lands extending from the *Page 221 
thread of the original stream to a point sixty-six feet from the original bank.[10]
The particular lake in question is known as Marshmiller Lake. I have been informed by the Department of Natural Resources that it is a natural lake. Apparently, and according to the records of the Department of Natural Resources, the lake was enlarged by the construction of a dam. The records of the department show that the dam was constructed in 1870. However, permission to construct and maintain the dam was given to one Marshall Miller and L. C. Stanley, some thirteen years later by ch. 230, Laws of 1883. This subsequent act of the legislature may have been in the nature of ratifying an existing situation. In any event, it does appear that the lake may have existed in its present form as early as the date of the sale or May, 1912.
Conclusion
It is my opinion that fee title to the sixty-six foot strip of shoreland is in the State of Wisconsin. This opinion is not dependent on whether the subject lands are school lands, nor is it dependent on whether the act reserving such lands was constitutional or unconstitutional. The conclusion is based on the documents surrounding the transaction which are unambiguous and show that the land was not conveyed. Grosshans v. Rueping
(1967), 36 Wis.2d 519, 153 N.W.2d 619.
The intent not to convey was clearly expressed in the documents pertaining to the transaction. The fact that such intent may have been motivated by what appears to be an unconstitutional statute does not vitiate the clear intent and act of the parties.
At this point in time, the lands constitute school lands (sec.24.145, Stats.). If in the judgment of the board such lands should now be sold, they should be appraised and publicly offered as required by law.
 The Reservation of Lesser Interests Under Ch. 452, laws of 1911
In addition to retention of the fee interest in the sixty-six foot water frontage strip, the statute provided for retention of certain *Page 222 
lesser interests. These interests which were to be retained included a right of access to the retained water frontage strip, all rights necessary to the full enjoyment of the waters, retention of the mineral rights and other rights.
The question is: in what parcel of land are these lesser interests located? Are these lesser interests to be retained in the water frontage strip, or in the parcel actually conveyed? There is no difficulty with the interest described as the right of access. This interest, of course, was to be retained in the parcel conveyed so that the public could cross the private lands to get to the retained lands.
The statute and the certificate cited above first refer to the retention of the fee interest in the sixty-six foot abutting strip. The retention of these other interests is then referred to in conjunction with "such lands," or "said lands." One possible construction is that the language "such lands" or "said lands" does refer to the retained strip. Under this construction, little effect is given to those words of the statute that retain these lesser rights, for the fee interest, with the exception of the right of access, would have included such lesser rights in any event. This construction would appear to violate the rule of statutory construction that effect must be given, if possible, to every word and clause of the statute. Prechel v. City of Monroe
(1968), 40 Wis.2d 231, 161 N.W.2d 373.
A second possible construction is to say that these lesser interests only relate to those lands not retained. This construction, at first blush appears to be reasonable, for it gives effect to retention of the fee interest, as well as effect to retention of the lesser interests.
The third possible construction would be to say that these lesser interests relate to both the intended retained parcel or water frontage strip, as well as the parcel actually conveyed.
In my opinion, sec. 6 of ch. 452, Laws of 1911, constitutes a coherent, consistent plan of land use only when it is interpreted to apply to that portion of the public lands which are conveyed to a private party. Under that interpretation, the state conveys the tract of land but retains to the public the right to benefit from any mineral deposits therein. The last sentence in the act assures the buyer that the reserved public rights will not prevent the use of the *Page 223 
sand, gravel and building stone found on the land. Thus, the rights conveyed to the private party are sufficient for agricultural, residential and recreational use. The rights reserved to the public are associated with commercial exploitation of subsurface resources, recreational use of the navigable waters and the development of water power. By contrast, to say that "said lands" and "such lands" refer only to the sixty-six foot strip along navigable waters is both impractical and renders the entire reservation statute a meaningless redundancy. Certainly, there is no need to expressly reserve mineral interests in land that is already held in fee simple. The reservation under that interpretation would be redundant and the sand, gravel and stone exception becomes entirely meaningless. Beyond that, I am unable to perceive any rational legislative purpose or public benefit to be derived from a mining operation restricted to a long, twisting, sixty-six foot strip of shoreline.
Accordingly, it is my opinion that it was the intent of the statute to retain these other interests in those lands which were, in fact, conveyed by the state. Actually the statute, as it now reads, clearly retains these other interests in the entire parcel conveyed (sec. 24.11 (3), Stats.).
The character, magnitude and value of these lesser interests raises the issue of whether such provisions independently considered are in harmony with Art. X, Wis. Const., when applied to school lands.
Under Art. X, and from the extensive discussion in State exrel. Owen v. Donald, supra, it appears that the commissioners have the responsibility as trustees of the school fund to produce as much income as reasonably possible for the support of the schools. Can the legislature legitimately frustrate the sale and value of school lands by retaining public interests in such lands? The Constitution vests in the commissioners the authority and responsibility to sell such lands. The Constitution does not provide that the legislature may direct the state to retain an interest or interests in such lands. In my opinion, these interests are of such magnitude that they would most certainly affect value. For example, if the public had the right to use the entire parcel to the extent "necessary to the full enjoyment of such waters," such public reservation would seriously affect marketability and value. *Page 224 
There are serious questions regarding the constitutionality of these provisions as applied to school lands. However, as in the situation of the retained fee interest, these lesser interests were expressly retained in the documents pertaining to the transaction. Under Art. X, sec. 8, Wis. Const., the commissioners have the power to withhold from sale "any portion of such lands." As the commissioners may clearly withhold such lands from sale, then in my opinion, they may withhold from sale particular interests in such lands. The constitution does contemplate the eventual sale of such lands. Similarly, I must conclude that the commissioners in their discretion, must sometime offer these lesser interests for public sale.
In conclusion, it is my opinion that the act of the legislature which intended to permanently set aside or reserve the lesser interests, was unconstitutional as applied to school lands. However, regardless of the constitutionality of the statute, these lesser interests in the entire parcel were expressly retained. The state presently holds such interests and they should be offered for public sale when the commissioners deem it expedient.
General Observations
The foregoing discussion covered issues that were not particularly relevant to the specific lands in question. However, the statute was in existence from 1911 to 1951 and during this period of forty years there were literally hundreds of transactions involving sales by the commissioners of public lands. Under the broad language of the act all transactions would be subject to the provisions of the statute.
The issues are of great public, as well as private, concern as considerable interest and publicity has been evidenced.
The following summation and discussion of the legal principles involved may be of some benefit if and when additional inquiries are made regarding these forty years of public land transactions.
School Lands
As to school lands, it is my opinion that the entire statute was unconstitutional; that no fee interest or lesser interests were retained by the state because of, or due to the statute alone. However, if the documents pertaining to a particular transaction expressly provided for the retention of such interests, then such *Page 225 
interests were, in fact and law, retained, for this was the intent of the parties.[11]
Thus, in each instance involving school lands, the documents reflecting such transaction must be examined to determine if the lands and interests in lands were expressly reserved by some language in the specific documents.
It is to be kept in mind that grants of land by a public body are to be construed most strongly against the grantee. Brody v.Long (1961), 13 Wis.2d 288, 108 N.W.2d 662.
Non-School Lands
The statute, as applied to non-school lands, was not repugnant to the Constitution. Therefore, it is not necessary to examine specific documents pertaining to the transactions, for the provisions of the statute were incorporated into said documents by operation of law.[12]
Thus, the state now holds title to the fee interest in any strip of land abutting navigable waters and the lesser interests as well, if the transaction occurred during the period under consideration.
Mining Rights
From the discussion above under the heading "Reservation of Lesser Interests," it is apparent that during the period from the enactment of ch. 452, Laws of 1911, until the 1951 amendment, the state reserved certain interests in the land, including mining rights.
Section 24.11 (3), Stats., from the 1951 amendment to the present time, has reserved mining rights in all public land transactions, as the issue of mining rights is presented by the current language of sec. 24.11 (3), and because of the recent public interest, a brief discussion is deemed appropriate. *Page 226 
Section 24.11 (3), as it now reads, presents a strange anomaly in the law which can be best appreciated by an examination of the legislative history involving mining rights. This discussion is not intended to be exhaustive of the subject matter, but is merely intended to raise the issue, for, in my opinion, there is no clear answer short of judicial determination or legislative action.
For over one hundred years, the state has reserved mining rights in lands sold, but not completely paid for. Section 52 of ch. 28 of the 1858 Statutes, provided that the certificate of sale did not carry with it any mining rights.[13] The purpose of such reservation was, of course, to protect the state in the event of nonpayment or forfeiture. This same type of reservation can be found today in sec. 24.24 (2), Stats.
It appears that up to the enactment of ch. 452, Laws of 1911, the state did not retain any mining rights, but relinquished such rights upon issuance of the patent.
Following the enactment of ch. 452, Laws of 1911, and up to the amendment of 1951, the state, in all transactions attempted to retain mining rights. As to school lands, I have concluded that the statute requiring retention of these rights, including mining rights, was constitutionally questionable. However, such rights, including mining rights, were retained by the state if the conveyancing instruments so provided.
As to non-school lands, mining rights were retained in any transaction between 1911 and 1951.
In summation, it is my conclusion that:
 1. Patents issued prior to the enactment of ch. 452, Laws of 1911, did not reserve to the state mining rights unless for some reason such reservation was expressly stated in the patent.
 2. Between the years 1911 and 1951, mining rights were reserved in transactions involving non-school lands. This reservation exists by operation of law and even in the absence of express language in the certificate or patent. *Page 227 
 3. Between the years 1911 and 1951, no mining rights were reserved in school lands by operation of law. However, if the documents expressly refer to such reservation, such rights were reserved to the state by agreement.
This discussion now leads us to consideration of sec. 24.11
(3), Stats. (1973).
Section 24.11 (3), Stats. (1973)
Section 24.11 (3), Stats., provides:
 "RESERVATION. Every contract, certificate of sale, or grant hereunder of public lands shall reserve to the people the right of access to such lands and to any meandered or nonmeandered stream, river, pond or lake navigable in fact for any purpose whatsoever, bordered by such lands and all rights necessary to the full enjoyment of such waters, and of all minerals in said lands, and all mining rights therein, and shall also be subject to continued ownership by the state of all waterpower rights on such lands or in any manner appurtenant thereto. Such conveyance shall also be subject to a continuing easement in the state and its assigns to enter and occupy such lands in any manner necessary and convenient to the removal of such mineral from such lands and to the proper exercise of such mineral rights, and shall be further subject to the continuing easement in the state and its assigns to enter and occupy such lands in any manner necessary and convenient to the development, maintenance and use of any such water rights. Nothing contained in this section shall be construed to provide for the continued ownership in the state of any stone used for building purpose nor of any sand or gravel."
The above-quoted statutory language has remained the same since the amendment of 1951. Although the provision no longer refers to retention of the fee interest, the other lesser interests are retained.
Accordingly, any and all transactions since 1951 presumably would be subject to such reservations. It is my opinion that such broad and extensive reservations would so seriously affect the value of school lands that the statute would be unconstitutional as *Page 228 
applied to school lands.[14] Therefore, in my further opinion, such reservations could not by operation of law be incorporated into the documents pertaining to the transaction. If, on the other hand, the documents expressly retained such rights, then the state possesses such rights by express agreement of the parties. It is my opinion that the state does not, under the Constitution, have the right to permanently retain these interests in school lands and such interests should be sold[15] at such time as the commissioners deem it advisable.
As to non-school lands, I am of the opinion that such described interests have been retained by the state and under sec. 24.11
(3) cannot be sold outright, but some of the interests may, in specific situations, be assigned, as for example, the right to mine a particular ore.
Fiduciary Duties
The commissioners of public lands have a constitutional duty to act as trustees in the sale of school and university lands for the exclusive benefit of the State School Fund, Art. X, sec. 7, Wis. Const. This duty necessarily implies an obligation to maximize the financial benefit from the sale of such lands or interest in such lands. Thus, where the law regarding public lands is uncertain, as it seems to be with regard to the reservation of real property rights, the commissioners are required by law, despite any natural and unavoidable sympathy for the private property owners, to advance that reasonable legal interpretation most favorable to the interests of the school fund.
Finally, I would point out that the issues involved herein are so complex and important that, in fairness to the public and private interests involved, they can only be fully resolved in a judicial proceeding or proceedings.
BCL:CAB
[1] Section 4978, Stats. (1917) was in the nature of a revisor's bookkeeping entry or more accurately, a housekeeping entry. The practice dates back to the time when the statutes were not biannually published and it was essential to avoid confusion and error. A full explanation of this practice can be found in 1930 Wis. Anno., under sec. 371.01, successor to sec. 4978. Section 371.01 is now sec. 991.01. Also see sec. 990.03 (3).
[2] Retroactive application of sec. 300.10 Stats. (1931), would raise the constitutional question of whether the legislature may grant title to public trust lands when such authority is exclusively vested in the commissioners. This constitutional issue will not be discussed for the law of adverse possession appears to be dispositive.
[3] footnotes omitted, no Wisconsin authority given.
[4] Other lands which fall within the category of school lands are Rock River Canal Act of June 18, 1838; 500,000 Acre Lands. Act of September 4, 1841; Sixteen Section, Act of August 6, 1846; Indemnity School Lands. Act of February 26, 1859; Indemnity Swamp Lands, Act of March 2 1855; University Lands, Act of June 12, 1838; Agricultural College, Act of July 2, 1862; Source of this enumeration is a revisor's note or annotation under Art. X, sec. 2, Wis. Const., found in Vol. 2, 1927 Stats. To be precise, "University Lands' are not "School Lands," as that term is used herein. However, for our purposes, university lands may be considered as "school lands" for the legal principles discussed are applicable to such lands, the same as If they were "school lands."
[5] See report of referee in State ex rel. Owen v. Donald
(1916), 162 Wis. 609, 157 N.W. 946, which appears to vitiate the division of swamp lands between the drainage fund and the school fund with the result that all such swamp lands constitute normal school lands.
[6] The definition of navigable waters was changed in Mueneh [Muench]v. Public Service Comm. (1951), 261 Wis. 492, 53 N.W.2d 514. Navigable, in fact, now refers to any stream capable of floating any boat, skiff or canoe, etc. As the period of the statute in question runs from 1911 to 1951, the earlier definition would seem more appropriate. See also Degayner and Company v. DNR
(1975), 70 Wis.2d 936, 236.
[7] A note found in the bill jacket in the Legislative Reference Library pertaining to the amendment of sec. 24.11 (3), Stats. (1949) by ch. 279, Laws of 1951, states:
"24.11 (3) Amended. `The reservation to State of the 1 chain (66') on the sale of State School Lands on meandered or nonmeandered streams rivers, ponds and lakes should be eliminated. I feel such a reservation as it affects the constitutional trust lands (under our jurisdiction) is unconstitutional as it tends to kinder the sale of such land for the benefit of the school funds, or the full value is not received of the lands which were originally granted to the state for school purposes. (The state conservation department possibly would not be in favor of the repeal of this part of this section as far as it concerns the state park and forestry lands under their control.)" [Authored by T. H. Bakken, Chief Clerk of the Commissioners of Public Lands.]
[8] Chapter 537, Laws of 1865, equally divided the stamp land grants of September 28. 1850 and March 2, 1855, between the school fund and the drainage fund. However, as indicated in n. 5, it was held in State ex rel Owen v. Donald, supra, at 620, that the drainage fund was vitiated by subsequent acts of the legislature with the result that all such lands are to be treated as school lands. Also see sec. 24.145, Stats.
[9] Title to submerged lands of an artificial lake is not in the state, nor necessarily in titleholder to the bank, but depends on title to the bed itself. Skalitsky v. ConsolidatedBadger Coop. (1948), 252 Wis. 132, 31 N.W.2d 153.
[10] Title to submerged lands of an artificial lake depends on title to the bed. Skalitsky v. Consolidated Badger Coop.,supra. Ownership of the bed of a stream may be separated from the abutting lands. Norcross v. Griffiths (1886), 65 Wis. 599,27 N.W. 606; Bright v. City of Superior (1916), 163 Wis. 1,156 N.W. 600.
[11] Even assuming the parties were of the belief that the provisions of sec. 209, subsec. 6, Stats. (1911), were valid and controlling, this belief which I have concluded would have been in error, is not the type of mutual mistake as to void the entire contract. 17 Am. Jur. 2d sec. 143, Contracts. Such result would create even greater problems.
[12] In State ex rel. Bldg. Owners and Managers Ass'n ofMilwaukee, Inc. v. Adamany (1974), 64 Wis.2d 280, 294,219 N.W.2d 274, it was held that every contract is subject to the law of the state, when written.
[13] Section 52, ch. 28, Stats. (1858), only applied to school and university lands. Section 26 of ch. 29, Stats. (1858), presumably made the provisions of sec. 52, ch. 28, applicable to all swamp lands.
[14] Art. X. secs. 7 and 8, Wis. Const., vests in the commissioners the power to withhold lands (or interests in lands) from sale. The statute infringes upon their discretion. State exrel. Sweet v. Cunningham, supra; State ex rel. Owen v. Donald,supra.
[15] The retention of such interests in lands sold to other state agencies is also involved. In such instances, the interests may be sold by the commissioners and the proceeds credited to the school fund. This is also true for transactions that occurred prior to the 1951 amendment of sec. 24.11 (3). Stats. *Page 229